# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2016AP1982 |

| | |
|---|---|
| COMPLETE TITLE: | In the matter of the mental commitment of C.S.:<br><br>Winnebago County,<br>　　　　Petitioner-Respondent,<br>　　v.<br>C. S.,<br>　　　　Respondent-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 386 Wis. 2d 612,927 N.W.2d 576
PDC No:2019 WI App 16 - Published

| | |
|---|---|
| OPINION FILED: | April 10, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 15, 2020 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| 　COURT: | Circuit |
| 　COUNTY: | Winnebago |
| 　JUDGE: | Karen L. Seifert & Barbara H. Key |

JUSTICES:
ZIEGLER, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, KELLY, and DALLET, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion. HAGEDORN, J., filed a dissenting opinion, in which ROGGENSACK, C.J., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the respondent-appellant-petitioner, there were briefs filed by *Kaitlin A. Lamb*, assistant state public defender. There was an oral argument by *Kaitlin A. Lamb*.

For the petitioner-respondent, there was a brief filed by *Mary A. Mueller*, *Catherine B. Scherer,* and *Winnebago County office of Corporation Counsel*, Oshkosh. There was an oral argument by *Mary A. Mueller*.

An amicus curiae brief was filed on behalf of the Attorney General by *Maura FJ Whenal*, assistant attorney general; with whom on the brief is *Joshua L. Kaul*, attorney general.

An Amicus curiae brief was filed on behalf of Disability Rights Wisconsin by *Todd G. Smith, Deborah Machalow*, and *Godfrey & Kahn*, Madison.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.  2016AP1982
 (L.C. No.  2015ME267)

STATE OF WISCONSIN           :           IN SUPREME COURT

**In the matter of the mental commitment of C.S.:**

**Winnebago County,**

        **Petitioner-Respondent,**

  **v.**

**C.S.,**

        **Respondent-Appellant-Petitioner.**

**FILED**

**APR 10, 2020**

Sheila T. Reiff
Clerk of Supreme Court

ZIEGLER, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, KELLY, and DALLET, JJ., joined.  REBECCA GRASSL BRADLEY, J., filed a dissenting opinion.  HAGEDORN, J., filed a dissenting opinion, in which ROGGENSACK, C.J., joined.

        REVIEW of a decision of the Court of Appeals.  *Reversed and cause remanded.*

        ¶1  ANNETTE KINGSLAND ZIEGLER, J.   This is a review of a published decision of the court of appeals, Winnebago County v. C.S., 2019 WI App 16, 386 Wis. 2d 612, 927 N.W.2d 576 ("C.S. III"), affirming the Winnebago County circuit court's order of extension of commitment, order for involuntary medication and treatment, and

order denying C.S.'s postcommitment motion.[1] C.S. suffers from schizophrenia and was an inmate in the Wisconsin prison system. While he was incarcerated, C.S. was committed and determined incompetent to refuse medication pursuant to Wis. Stat. § 51.61(1)(g) (2015-16)[2] and, therefore, was the subject of multiple involuntary medication court orders.

¶2 C.S.'s commitment and involuntary medication orders were not based upon a determination of dangerousness because neither Wis. Stat. § 51.20(1)(ar) nor Wis. Stat. § 51.61(1)(g)3. require a determination of dangerousness. Rather, under § 51.20(1)(ar), C.S. was committed based on determinations that he was mentally ill, a proper subject for treatment, and in need of treatment. Then, under § 51.61(1)(g)3., C.S. was involuntarily medicated because he was determined incompetent to refuse medication. Accordingly, the crux of the issue in this case is whether § 51.61(1)(g)3. is facially unconstitutional when an inmate committed under § 51.20(1)(ar) is involuntarily medicated based on a determination of incompetence to refuse medication only——without any determination of dangerousness at any stage.

¶3 C.S. argues that Wis. Stat. § 51.61(1)(g)3. is unconstitutional when it permits the involuntary medication of any inmate who was committed under Wis. Stat. § 51.20(1)(ar) without

---

[1] The Honorable Karen L. Seifert entered the order extending C.S.'s commitment and the order for involuntary medication and treatment. The Honorable Barbara H. Key entered the order denying C.S.'s postcommitment motion.

[2] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

a determination that the inmate is "dangerous" at any stage in the proceedings. Winnebago County argues the statute is facially constitutional and invokes the County's parens patriae power. The County posits that it has a legitimate interest in the care and assistance of a mentally ill and incompetent inmate, thus eliminating any need for a determination of dangerousness with respect to an involuntary medication order of an inmate.

¶4 The court of appeals concluded that "the involuntary medication and treatment of a prisoner is facially constitutional as there is a legitimate reason for the [S]tate to medicate/treat even when there is no finding of dangerousness——the general welfare of the prisoner." C.S. III, 386 Wis. 2d 612, ¶8. We reverse.

¶5 We conclude that Wis. Stat. § 51.61(1)(g)3. is facially unconstitutional for any inmate who is involuntarily committed under Wis. Stat. § 51.20(1)(ar), which does not require a determination of dangerousness, when the inmate is involuntarily medicated based merely on a determination that the inmate is incompetent to refuse medication. Incompetence to refuse medication alone is not an essential or overriding State interest and cannot justify involuntary medication. Accordingly, we reverse the court of appeals and remand to the circuit court with an order to vacate C.S.'s June 2015 order for involuntary medication and treatment.

I.  FACTUAL BACKGROUND AND PROCEDURAL POSTURE[3]

¶6   Because this is a facial challenge, the relevant facts are few.  C.S. suffers from schizophrenia.  In 2005 C.S. was convicted of mayhem as a repeat offender and sentenced to ten years of initial confinement and ten years of extended supervision.  In 2012 Winnebago County petitioned to involuntarily commit and medicate C.S.  C.S. has since been subject to multiple involuntary commitment orders, involuntary medication orders, and extensions thereof.

¶7   C.S. previously challenged his involuntary commitment before this court.  He argued that an involuntary commitment statute, Wis. Stat. § 51.20(1)(ar) (2013-14), was facially unconstitutional because it allows the involuntary commitment of an inmate without a conclusion of dangerousness.  We rejected that argument and concluded that § 51.20(1)(ar) is "reasonably related to the State's legitimate interest in providing care and assistance to inmates suffering from mental illness."  Winnebago County v. Christopher S., 2016 WI 1, ¶24, 366 Wis. 2d 1, 878 N.W.2d 109 ("C.S. I").  C.S. did not challenge the constitutionality of Wis. Stat. § 51.61(1)(g)3. at that time.  But he does now.

¶8   Relevant to C.S.'s current challenge to his involuntary medication, Winnebago County petitioned for an extension of C.S.'s

_____

[3] C.S. is currently challenging his involuntary medication order.  C.S. also previously challenged his involuntary commitment before this court.  For a more detailed discussion of the factual and procedural history of this case, we refer the reader to our prior opinion, Winnebago County v. Christopher S., 2016 WI 1, 366 Wis. 2d 1, 878 N.W.2d 109 ("C.S. I").

commitment in May 2015.[4] The petition asserted that it was the "opinion and recommendation of the Department of Human Services" that C.S. was mentally ill, a proper subject for treatment, and that there was a substantial likelihood that C.S. would be a proper subject for commitment if treatment were withdrawn. Winnebago County attached to the petition a letter from Dr. Kate Keshena. Dr. Keshena stated her opinion to a reasonable degree of medical certainty that C.S. "continue[d] to have substantial disorders of thought, mood and perception" and was "incapable of expressing an understanding of the advantages" of his psychotropic medication "or appreciating how he benefits from them." Essentially, Dr. Keshena concluded that C.S. was mentally ill and incompetent to refuse medication.

¶9  C.S. objected to the extension and the circuit court held a jury trial in June, 2015. The jury found that the elements of Wis. Stat. § 51.20(1)(ar) were met. Specifically, the jury found that: (1) C.S. was mentally ill; (2) C.S. was a proper subject for treatment and in need of treatment; (3) C.S. was an inmate in a Wisconsin state prison; (4) less restrictive forms of appropriate treatment had been attempted unsuccessfully; and (5) C.S. had been fully informed of his treatment needs, the mental health services available to him, and his rights, and he had an opportunity to discuss those matters with a licensed physician or

---

[4] C.S. also challenged his June 2014 orders of extension, but the court of appeals dismissed that challenge as moot. Winnebago County v. C.S., No. 2016AP1955, unpublished slip op. (Wis. Ct. App. Aug. 16, 2017) ("C.S. II"). We do not review that decision.

5

psychologist. See § 51.20(1)(ar). On June 30, 2015, the circuit court entered an order of extension of commitment and an order for involuntary medication and treatment. Pursuant to Wis. Stat. § 51.61(1)(g), the order for involuntary medication stated that the order was "due to" "mental illness" and that C.S. was "not competent to refuse psychotropic medication or treatment because" he was "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his condition in order to make an informed choice as to whether to accept or refuse psychotropic medications." Importantly, at no point in these proceedings did Winnebago County allege, the jury find, or the circuit court conclude that C.S. was dangerous. Thus, the circuit court order permitted Winnebago County to involuntarily medicate C.S. merely because he was mentally ill and incompetent to refuse medication——without any finding or conclusions regarding dangerousness.

¶10 In July, 2015 C.S. was released from prison and began extended supervision. After his release, C.S. was no longer subject to the involuntary commitment or involuntary medication orders. C.S. then filed a notice of intent to pursue postcommitment relief and a motion for postcommitment relief. He argued that Wis. Stat. § 51.61(1)(g) is facially unconstitutional for any inmate involuntarily committed under Wis. Stat. § 51.20(1)(ar) without a conclusion of dangerousness. On September 15, 2016, the circuit court held a hearing and issued an order denying C.S.'s postcommitment motion. The circuit court concluded that Winnebago County could involuntarily medicate C.S.

6

pursuant to § 51.61(1)(g) because it was in the legitimate interests of both the County and C.S.

¶11  On October 6, 2016, C.S. filed a notice of appeal and the court of appeals stayed the appeal pending its decision in Winnebago County v. C.S., No. 2016AP1955, unpublished slip op. (Wis. Ct. App. Aug. 16, 2017) ("C.S. II") (concluding that C.S.'s challenge to his June 2014 orders of extension was moot).  Then, on March 27, 2019, the court of appeals affirmed in C.S. III.  The court of appeals acknowledged that C.S. was no longer subject to the June 2015 involuntary commitment and involuntary medication orders.  It stated, "Although this case is moot, for the reasons stated in C.S. I, 366 Wis. 2d 1, ¶¶30-32, we will reach the merits of this appeal."[5]  C.S. III, 386 Wis. 2d 612, ¶2 n.4.  It then concluded that "the involuntary medication and treatment of a prisoner [pursuant to Wis. Stat. § 51.61(1)(g)] is facially constitutional as there is a legitimate reason for the State to medicate/treat even when there is no finding of dangerousness——the general welfare of the prisoner."  Id., ¶8.

---

[5] In C.S. I we concluded that although C.S.'s original commitment order was expired, we would nonetheless review it under an exception to the mootness doctrine because "the issues presented [were] of great public importance as they would affect a large number of persons in the Wisconsin State prison system."  C.S. I, 366 Wis. 2d 1, ¶32.  The court of appeals applied this same logic to C.S.'s current challenge to his involuntary medication order.  Now we do as well.  Even if moot, C.S.'s facial challenge to Wis. Stat. § 51.61(1)(g) is "of great public importance" and "would affect a large number of persons in the Wisconsin State prison system."  Id.  Accordingly, this court will also reach the merits of C.S.'s challenge.

¶12  On April 26, 2019, C.S. petitioned this court for review. We granted the petition.

II.   STANDARD OF REVIEW

¶13 This case requires the court to review the constitutionality of portions of Wis. Stat. § 51.61(1)(g)3.  The constitutionality of a statute is a question of law we review de novo.  State v. Wood, 2010 WI 17, ¶15, 323 Wis. 2d 321, 780 N.W.2d 63.

¶14 C.S. brings a facial challenge to Wis. Stat. § 51.61(1)(g)3. to the extent that it permits the involuntary medication of an inmate involuntarily committed under Wis. Stat. § 51.20(1)(ar) without a determination of dangerousness.  "Under a facial challenge, 'the challenger must show that the law cannot

8

be enforced under any circumstances.'"[6]  C.S. I, 366 Wis. 2d 1, ¶34 (quoting Wood, 323 Wis. 2d 321, ¶13).  We presume that the statute under review is constitutional and the burden is on the party challenging the statute to prove that it is unconstitutional beyond a reasonable doubt.  Id.; State v. Fitzgerald, 2019 WI 69, ¶12, 387 Wis. 2d 384, 929 N.W.2d 165.  "'[B]eyond a reasonable doubt' expresses the force or conviction with which a court must conclude, as a matter of law, that a statute is unconstitutional before the statute . . . can be set aside."  Mayo v. Wisconsin Injured Patients & Families Comp. Fund, 2018 WI 78, ¶27, 383 Wis. 2d 1, 914 N.W.2d 678.  Thus, C.S. must prove beyond a

---

[6] A typical facial challenge comes to this court in this form: a party asks us to conclude that a law is always unconstitutional in every possible application to every possible person.  C.S.'s challenge is a facial one that presents itself differently.  He does not challenge the entirety of Wis. Stat. § 51.61(1)(g).  Nor does he challenge every possible application of it to both inmates and non-inmates.  Rather, C.S. brings a categorical facial challenge.  Specifically, he presents a categorical facial challenge to a portion of § 51.61(1)(g)3. when its language permits the involuntary medication of any inmate who is committed under Wis. Stat. § 51.20(1)(ar) based merely on a determination that the inmate is incompetent to refuse medication.  We have previously made clear that this categorical approach to a facial challenge is still a facial challenge and is subject to the same facial challenge standard.  See Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶29, 376 Wis. 2d 147, 897 N.W.2d 384 ("Judge Gabler by no means seeks to invalidate the entirety of Chapter 950 as contrary to the Wisconsin Constitution.  But he does contend that the Board can never constitutionally take action against a judge under Wis. Stat. § 950.09(2)(a), (2)(c)-(d), or (3).  To prevail, Judge Gabler therefore must meet the standard for a facial challenge and demonstrate that the disputed portions of Wis. Stat. § 950.09 'cannot be constitutionally enforced' by the Board against judges 'under any circumstances.' Tammy W-G. v. Jacob T., 2011 WI 30, ¶46, 333 Wis. 2d 273, 797 N.W.2d 854 (quoting Soc'y Ins. v. LIRC, 2010 WI 68, ¶26, 326 Wis. 2d 444, 786 N.W.2d 385).").

reasonable doubt that § 51.61(1)(g)3. is facially unconstitutional "under all circumstances" involving the involuntary medication of any inmate, who was involuntarily committed under § 51.20(1)(ar), based merely on a determination of incompetence to refuse medication.[7]  C.S. I, 366 Wis. 2d 1, ¶34.

---

[7] C.S. argues that the "beyond a reasonable doubt" standard results in excessive deference to the legislature, to the detriment of the constitutional balance of authority between the judicial and legislative branches.  C.S. invites this court to correct the alleged imbalance, adopt the United States Supreme Court's standard, and require a "plain showing" or "clear demonstration" of unconstitutionality instead, citing Mayo v. Wisconsin Injured Patients & Families Comp. Fund, 2018 WI 78, ¶¶79, 90, 383 Wis. 2d 1, 914 N.W.2d 678 (Rebecca Grassl Bradley, J., concurring).  We heard a similar argument last term in State v. Fitzgerald, 2019 WI 69, 387 Wis. 2d 384, 929 N.W.2d 165.  However, just as in Fitzgerald, "[w]e need not resolve" C.S.'s challenge to our standard because Wis. Stat. § 51.61(1)(g)3. is "undoubtedly unconstitutional" when it permits the involuntary medication of an inmate involuntarily committed under Wis. Stat. § 51.20(1)(ar), which does not require a determination of dangerousness, based merely on a determination that the inmate is incompetent to refuse.  Id., ¶12.  We decline to adopt a different standard today.

III. ANALYSIS

A. Involuntary Commitment And Involuntary Medication Statutes

¶15 C.S. argues that it is unconstitutional to involuntarily medicate an inmate without a conclusion of "dangerousness."[8] This argument is rooted in a comparison with people who are not inmates. As we explain below, in order to involuntarily medicate a person who is not in prison, the petitioner (here, Winnebago County) must prove that the subject is dangerous, as that term is statutorily defined. Yet, under Wis. Stat. § 51.61(1)(g)3., C.S. and other inmates, unlike others committed, can be involuntarily medicated without a determination of dangerousness. This distinction between inmates and non-inmates is embedded in the Wisconsin Statutes. Thus, before delving into our analysis in this case, we will summarize the involuntary commitment and involuntary medication statutory schemes in Wisconsin. We begin with non-inmates.

¶16 To involuntarily commit a non-inmate, the petitioner must prove that the non-inmate is mentally ill, a proper subject for treatment, and dangerous. See Wis. Stat. § 51.20(a)(1)-(2).

---

[8] At argument, counsel for C.S. clarified that, for purposes of his argument, C.S. uses "dangerousness" broadly to refer to an individualized showing that medication is necessary to prevent serious physical harm to the inmate or others. Accordingly, C.S. argues that Wis. Stat. § 51.61(1)(g)3. is facially unconstitutional to the extent that it permits the involuntary medication of any inmate who was involuntarily committed under Wis. Stat. § 51.20(1)(ar), without an individualized showing that medication is necessary to prevent serious physical harm to the inmate or others. Like C.S., we will use "dangerousness" as a shorthand for this individualized showing.

There are five different definitions of dangerousness under § 51.20(a)(2), but all require a "substantial probability" of harm to that person or another. See § 51.20(a)2.a.-e.[9]

---

[9] Under Wis. Stat. § 51.20(1)(a)2.a.-e.:

The individual is dangerous because he or she does any of the following:

a. Evidences a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm.

b. Evidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm. . . .

c. Evidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals. . . .

d. Evidences behavior manifested by recent acts or omissions that, due to mental illness, he or she is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness. . . .

e. For an individual, other than an individual who is alleged to be drug dependent or developmentally disabled, after the advantages and disadvantages of and alternatives to accepting a particular medication or treatment have been explained to him or her and because of mental illness, evidences either incapability of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and

12

¶17 In contrast, to involuntarily commit an inmate, the petitioner need not prove dangerousness. Pursuant to Wis. Stat. § 51.20(1)(ar):

> <u>If the individual is an inmate of a state prison</u>, the <u>petition may allege that the inmate is</u> <u>mentally ill</u>, is <u>a proper subject for treatment</u> <u>and</u> is <u>in need of treatment</u>. The petition shall allege that appropriate less restrictive forms of treatment have been attempted with the individual and have been unsuccessful and it shall include a description of the less restrictive forms of treatment that were attempted. The petition shall also allege that the individual has been fully informed about his or her treatment needs, the mental health services available to him or her and his or her rights under this chapter and that the individual has had an opportunity to discuss his or her needs, the services available to him or her and his or her rights with a licensed physician or a licensed psychologist. The petition shall include the inmate's sentence and his or her expected date of release as determined under s. 302.11 or 302.113, whichever is applicable. The petition shall have attached to it a signed statement by a licensed physician or a licensed psychologist of a state prison and a signed statement by a licensed physician or a licensed psychologist of a state treatment facility attesting either of the following:

the alternatives, or substantial incapability of applying an understanding of the advantages, disadvantages, and alternatives to his or her mental illness in order to make an informed choice as to whether to accept or refuse medication or treatment; and evidences a substantial probability, as demonstrated by both the individual's treatment history and his or her recent acts or omissions, that the individual needs care or treatment to prevent further disability or deterioration and a substantial probability that he or she will, if left untreated, lack services necessary for his or her health or safety and suffer severe mental, emotional, or physical harm that will result in the loss of the individual's ability to function independently in the community or the loss of cognitive or volitional control over his or her thoughts or actions. . . .

    1.   That the inmate needs inpatient treatment at a state treatment facility because appropriate treatment is not available in the prison.

    2.   That the inmate's treatment needs can be met on an outpatient basis in the prison.

§ 51.20(1)(ar) (emphases added).  Thus, to involuntarily commit an inmate, the petitioner must prove that the inmate is mentally ill, a proper subject for treatment, and in need of treatment, but the petitioner need not prove dangerousness.

¶18 Once involuntarily committed, both inmates and non-inmates have a general right to refuse unwanted medication and treatment. Wisconsin Stat. § 51.61 details the rights of patients, including "any individual who is receiving services for mental illness[.]" § 51.61(1). Among those rights is the right to refuse medication and treatment.  § 51.61(1)(g).  But the statute also places some limits on a patient's right to refuse medication if certain requirements are met.  Patients "have the right to refuse all medication and treatment except as ordered by the court under [§ 51.61(1)(g)2.], or in a situation in which the medication or treatment is necessary to prevent serious physical harm to the patient or to others."  § 51.61(1)(g)1.  Under § 51.61(1)(g)2.:

> <u>At or after the hearing to determine probable cause for commitment but prior to the final commitment order</u>, . . . <u>the court shall</u>, upon the motion of any interested person, and may, upon its own motion, <u>hold a hearing to determine whether there is probable cause to believe that the individual is not competent to refuse medication or treatment and whether the medication or treatment will have therapeutic value and will not unreasonably impair the ability of the individual to prepare for or participate in subsequent legal proceedings</u>.  If the court determines that there is probable cause to believe the allegations under this

14

subdivision, the court shall issue an order permitting medication or treatment to be administered to the individual regardless of his or her consent.

§ 51.61(1)(g)2. (emphases added).   And § 51.61(1)(g)3., the subdivision we review in this case, states that following a final commitment order, patients:

> have the right to exercise informed consent with regard to all medication and treatment unless the committing court or the court in the county in which the individual is located, within 10 days after the filing of the motion of any interested person and with notice of the motion to the individual's counsel, if any, the individual and the applicable counsel under s. 51.20(4), makes a determination, following a hearing, that the individual is not competent to refuse medication or treatment or unless a situation exists in which the medication or treatment is necessary to prevent serious physical harm to the individual or others. A report, if any, on which the motion is based shall accompany the motion and notice of motion and shall include a statement signed by a licensed physician that asserts that the subject individual needs medication or treatment and that the individual is not competent to refuse medication or treatment, based on an examination of the individual by a licensed physician.

§ 51.61(1)(g)3. (emphases added).  Thus, under § 51.61(1)(g)3., a patient may be involuntarily medicated if: (1) "the individual is not competent to refuse medication" or; (2) "the medication . . . is necessary to prevent serious physical harm to the individual or others."   § 51.61(1)(g)3.   In this case, we review involuntary medication based on the former——incompetence to refuse medication.  We pause a moment to note what the portion of Wis. Stat. § 51.61(1)(g)3. which we review does not require.  It does not require a determination that the inmate is dangerous.  Nor does it require a determination that the medication is medically appropriate or in the inmate's medical interest.  Nor

15

does it require a determination that the inmate needs medication. Nor does it require an expert report of any kind. See § 51.61(1)(g)3. ("A report, if any, on which the motion is based shall accompany the motion and notice of motion . . . " (emphasis added).)

¶19 Wisconsin Stat. § 51.61(1)(g)4. defines incompetence in the context of involuntary medication.

> For purposes of a determination under subd. 2. or 3., an individual is not competent to refuse medication or treatment if, because of mental illness, developmental disability, alcoholism or drug dependence, and after the advantages and disadvantages of and alternatives to accepting the particular medication or treatment have been explained to the individual, one of the following is true:
>
> a. The individual is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives.
>
> b. The individual is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness, developmental disability, alcoholism or drug dependence in order to make an informed choice as to whether to accept or refuse medication or treatment.

§ 51.61(1)(g)4. (emphases added).

¶20 Thus, both inmates and non-inmates, once lawfully committed, may be involuntarily medicated based on a conclusion that either: (1) medication is "necessary to prevent serious physical harm"; or (2) they are "not competent to refuse medication." See Wis. Stat. § 51.61(1)(g)3. The relevant distinction is that the lawfully committed non-inmate has already been determined by a court to be dangerous, see Wis. Stat.

16

§ 51.20(1)(a)1.-2.a.-e., and the inmate need not be, see § 51.20(1)(ar). C.S.'s challenge is grounded in this statutory disparity. C.S. was not involuntarily medicated due to an independent conclusion of dangerousness. Nor was he involuntarily medicated because a court concluded that involuntary medication was "necessary to prevent serious physical harm." Rather, the circuit court's § 51.61(1)(g) involuntary medication order was based merely on a determination that C.S. was incompetent to refuse medication.[10] See § 51.61(1)(g)3. Thus, C.S. argues that § 51.61(1)(g)3. is facially unconstitutional to the extent that it permits the involuntary medication of any inmate, who is involuntarily committed under § 51.20(1)(ar), without a determination of dangerousness (or, based merely on a determination of incompetence to refuse medication). We agree.

B. Wisconsin Stat. § 51.61(1)(g)3. Is Facially
Unconstitutional For Any Inmate Involuntarily Committed
Under Wis. Stat. § 51.20(1)(ar) When The Inmate
Is Involuntarily Medicated Based Merely On A Determination
That The Inmate Is Incompetent To Refuse Medication.

¶21 Under the United States Constitution, no State shall "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. Amend XIV. All people have

---

[10] Accordingly, we do not review the involuntary medication of an inmate under Wis. Stat. § 51.61(1)(g)3. pursuant to a determination that the medication is "necessary to prevent serious physical harm." Nor do we review the involuntary medication of an inmate under § 51.61(1)(g)3m. pursuant to a determination that the inmate is dangerous under Wis. Stat. § 51.20(1)(a)2.e. We review only the involuntary medication of an inmate, who is committed under § 51.20(1)(ar), based merely on a determination of incompetence to refuse medication pursuant to § 51.61(1)(g)3.

17

a "'significant liberty interest'" in refusing involuntary medication. Fitzgerald, 387 Wis. 2d 384, ¶13 (quoting Washington v. Harper, 494 U.S. 210, 221 (1990)). We conclude that Wis. Stat. § 51.61(1)(g)3. is facially unconstitutional for any inmate who is involuntarily committed under Wis. Stat. § 51.20(1)(ar), which does not require a determination of dangerousness, when the inmate is involuntarily medicated based merely on a determination of incompetence to refuse medication. Our conclusion is rooted in a trilogy of United States Supreme Court involuntary medication cases, and our decisions in Fitzgerald, 387 Wis. 2d 384, and Lenz v. L.E. Phillips Career Development Center, 167 Wis. 2d 53, 482 N.W.2d 60 (1992)——all of which inform the content of an individual's "significant liberty interest" in refusing medication and the government's ability to infringe upon it.

¶22 To begin, in Washington v. Harper, the Supreme Court reviewed a prison policy which permitted the involuntary medication of an inmate if the inmate suffered from a "mental disorder" and was either "gravely disabled" or posed a "likelihood of serious harm" to self, another, or property. 494 U.S. at 215. Harper was an inmate and was involuntarily medicated on the basis of a mental disorder and a "likelihood of serious harm." See id. at 217. The Court stated that Harper "possesse[d] a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." Id. at 221-22. Indeed, involuntary medication is a significant intrusion of a person's body.

18

> The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. The purpose of [antipsychotic drugs] is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes. While the therapeutic benefits of antipsychotic drugs are well documented, it is also true that the drugs can have serious, even fatal, side effects.

Id. at 229 (citations omitted).

¶23 While an inmate's liberty interest is significant, "[t]he extent of a prisoner's rights under the [Due Process] Clause to avoid the unwanted [medication] must be defined in the context of the inmate's confinement." Id. at 222. "The legitimacy, and the necessity, of considering the State's interests in prison safety and security are well established[.]" Id. at 223. Furthermore, "[w]here an inmate's mental disability is the root cause of the threat he poses to the inmate population, the State's interest in decreasing the danger to others necessarily encompasses an interest in providing him with medical treatment for his illness." Id. at 225-26. In light of the inmates' and the State's competing interests, the Court upheld Harper's involuntary medication and concluded that, "given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." Id. at 227. Thus, the Harper Court held that a state may, if medication is in the inmate's medical interest, involuntarily medicate an inmate who is proven dangerous. To be

19

clear, the Court's rational basis analysis did not conclude that a state has a legitimate interest in involuntarily medicating an inmate absent a determination of dangerousness. Rather, it expressly linked the State's authority to involuntarily medicate to (1) dangerousness and (2) the inmate's medical interest. Id. at 227 (emphasis added) ("We hold that, given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest.") The portion of Wis. Stat. § 51.61(1)(g)3. which we review is not linked to either.[11] As a result, Harper does not answer the question we address here.

¶24 Next, in Riggins v. Nevada, the Supreme Court reviewed the involuntary medication of a criminal defendant during trial. 504 U.S. 127, 129 (1992). In doing so, it shed additional light on the Harper standard. The Court stated, "Under Harper, forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of [(1)] overriding justification and [(2)] a determination of medical appropriateness. The Fourteenth Amendment affords at least as much protection to persons the State detains for trial." Id. at 135. "Thus, once Riggins moved to terminate administration of antipsychotic medication [rendering

---

[11] Furthermore, the Harper Court (Washington v. Harper, 494 U.S. 210 (1990)) did not conclude that a mentally ill inmate's incompetence to refuse medication alone would survive rational basis review. Nor would it. A mentally ill inmate's incompetence to refuse medication alone is not reasonably related to a penological interest.

20

his medication involuntary], the State became obligated to establish the need for . . . and the medical appropriateness of the drug." Id. The Court held that Riggins' forced medication violated due process "[b]ecause the record contains no finding that might support a conclusion that administration of antipsychotic medication was necessary to accomplish an essential state policy[.]" Id. at 138.

¶25 The Riggins Court made clear that Nevada ran afoul of the Due Process Clause because the record regarding why Riggins needed medication was lacking. "Nevada certainly would have satisfied due process if the prosecution had demonstrated, and the District Court had found, that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others." Id. at 135 (citing Harper, 494 U.S. at 225-26). "Similarly, the State might have been able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins' guilt or innocence by using less intrusive means." Id. at 135 (citing Illinois v. Allen, 397 U.S. 337, 347 (1970) (Brennan, J., concurring) ("Constitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace.")). But the Court did not explicitly adopt a precise standard for forced medication during trial because it was sufficient to say that the district court did not make "any determination of the need for this course or any findings about reasonable alternatives." Id. at 136.

21

¶26 Third, in Sell v. United States, the Supreme Court reviewed the involuntary medication of a mentally ill defendant to render him competent to stand trial. 539 U.S. 166, 169 (2003). The Court summarized the crux of Harper and Riggins. Id. at 178-79. "In Riggins, the Court repeated that [under Harper] an individual has a constitutionally protected liberty 'interest in avoiding involuntary administration of antipsychotic drugs'——an interest that only an 'essential' or 'overriding' state interest might overcome." Id. (quoting Riggins, 504 U.S. at 134, 135). The Court then concluded:

> These two cases, Harper and Riggins, indicate that the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.

Id. at 179.

¶27 The Court made clear that the standard it set forth was a heavy burden for a State to justify involuntary medication. "This standard will permit involuntary administration of drugs solely for trial competence purposes in certain instances. But those instances may be rare." Id. at 180. "That is because the standard says or fairly implies the following: First, a court must find that important governmental interests are at stake." Id. (additional emphasis added). "Second, the court must conclude that involuntary medication will significantly further those

22

concomitant state interests." Id. at 181. "Third, the court must conclude that involuntary medication is necessary to further those interests." Id. (additional emphasis added). "Fourth, . . . the court must conclude that administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition." Id.

¶28 The Court then contrasted the standards set forth in Sell and Harper. Sell's standard was for the involuntary medication of a criminal defendant incompetent to stand trial. Sell, 539 U.S. at 181. But the standard in Harper addressed involuntary medication for a "different purpose, such as the purposes set out in Harper related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk." Id. at 182.[12] We note again that the portion of Wis. Stat. § 51.61(1)(g)3. which we review is not linked to dangerousness, the inmate's medical interest, or grave health risks.

¶29 Turning to this court and Wisconsin law, just last term we recognized that the Sell factors must be satisfied before a

---

[12] To the extent that Sell can be read as permitting involuntary medication under a lower standard than Harper-type dangerousness, we note that Sell sets the standard for involuntarily medicating a criminal defendant to render the defendant competent to stand trial only. Thus, the involuntary medication, though intruding on one of the defendant's constitutional rights, is aimed at protecting another——a fair trial. Indeed, the Sell Court framed the government interest at stake as "a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one." Sell v. United States, 539 U.S. 166, 180 (2003).

circuit court may order involuntary medication of a criminal defendant to render the defendant competent to stand trial. Fitzgerald, 387 Wis. 2d 384, ¶¶2, 35. We held that an involuntary medication statute, Wis. Stat. § 971.14(3)(dm) and (4)(b) (2017-18), was unconstitutional to the extent that it "require[d] circuit courts to order involuntary medication when the Sell factors have not been met, [because] the statute unconstitutionally infringe[d] the individual liberty interest in avoiding the unwanted administration of anti-psychotropic drugs." Id., ¶32.

¶30 This case is not controlled by the Sell and Fitzgerald factors. Rather, this case, like Harper, involves involuntary medication of an inmate for a "different purpose" than competence to stand trial.[13] Sell, 539 U.S. at 182. But our discussion in Fitzgerald of a person's significant liberty interest in avoiding involuntary medication is relevant to our analysis in this case. We said:

> Under the Due Process Clause, individuals have a "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." [Harper, 494 U.S. at 221]. "[O]nly an 'essential' or 'overriding' state interest" can overcome this constitutionally-

---

[13] Accordingly, our opinion in this case does not limit the constitutionality of involuntary medication of a defendant, absent a determination of dangerousness, for the purpose of rendering the defendant competent to stand trial under Sell, 539 U.S. 166, or Fitzgerald, 387 Wis. 2d 384.

> protected liberty interest. [Sell, 539 U.S. at 179 (quoting Riggins, 504 U.S. at 134)].[14]

Fitzgerald, 387 Wis. 2d 384, ¶13. Furthermore, we said, "[t]he mere inability of a defendant to express an understanding of medication or make an informed choice about it is constitutionally insufficient to override a defendant's 'significant liberty interest[.]'" Id., ¶25 (quoting Harper, 494 U.S. at 221) (emphasis added). Thus, we have already concluded that a mentally ill inmate's incompetence to refuse alone is not an essential or overriding interest justifying involuntary medication. Fitzgerald was not the first time that we stated that incompetence to refuse alone does not justify intrusions into a person's body.

---

[14] Some might argue that the language in Harper, 494 U.S. 210, establishes that the test for involuntary medication of an inmate is whether the regulation is reasonably related to a legitimate penological interest. But this conclusion fails to appreciate that Harper was not the Court's last word on the issue. It fails to appreciate the United States Supreme Court's subsequent statements in Riggins v. Nevada, 504 U.S. 127 (1992), and Sell, 539 U.S. 166; statements which this court already recognized in Fitzgerald, 387 Wis. 2d 384, ¶13. Together, the Harper/Riggins/Sell trilogy of cases sets forth a clear standard in involuntary medication cases like this: "Under the Due Process Clause, individuals have a 'significant liberty interest in avoiding the unwanted administration of antipsychotic drugs.' [Harper, 494 U.S. at 221]. 'O]nly an "essential" or "overriding" state interest' can overcome this constitutionally-protected liberty interest. [Sell, 539 U.S. at 179 (quoting Riggins, 504 U.S. at 134, 135)]." Fitzgerald, 387 Wis. 2d 384, ¶13.

Furthermore, even under a rational basis review, a mentally ill inmate's incompetence to refuse medication alone would still be constitutionally insufficient. Without more, mental illness and incompetence to refuse medication alone are not reasonably related to a legitimate penological interest. The State may not force a particular medication on a mentally ill inmate merely because the inmate is incompetent to refuse it.

25

¶31   In Lenz we made clear that incompetence does not diminish a person's right to refuse.  167 Wis. 2d at 74.  In that case, we reviewed "whether an incompetent individual in a persistent vegetative state has a right to refuse life-sustaining medical treatment, including artificial nutrition and hydration[.]"  Id. at 63.  We concluded "that an individual's right to refuse unwanted life-sustaining medical treatment extends to artificial nutrition and hydration."  Id. at 73.  We also concluded "that the right to refuse all unwanted life-sustaining medical treatment extends to incompetent as well as competent individuals."  Id.

> An incompetent individual does not relinquish the right to refuse unwanted treatment by virtue of incompetency. [In re Guardianship of Grant, 747 P.2d 445, 449 (Wash. 1987); Rasmussen by Mitchell v. Fleming, 741 P.2d 674, 686 (Ariz. 1987)] ("Other jurisdictions have unanimously concluded that the right to refuse medical treatment is not lost merely because the individual has become incompetent and has failed to preserve that right.") The existence and viability of a long established personal right does not hinge upon its prescient exercise, nor is it extinguished when one is adjudged incompetent.

Id. at 74.

¶32   Of course, C.S. was not in a persistent vegetative state and refusing life-sustaining treatment.  He was a mentally ill inmate refusing involuntary medication.  But the same logic applies.  "[T]he right to refuse [involuntary medication] extends to incompetent as well as competent [inmates]."  Lenz, 167 Wis. 2d at 73.  "We find no reason to differentiate between the rights of the competent and incompetent.  To the extent that it is possible,

26

both must be assured the benefit of the exercise of the same constitutional right of choice." Id. at 77.

¶33 Under Harper, Riggins, Sell, Fitzgerald, and Lenz, Wis. Stat. § 51.61(1)(g)3. is facially unconstitutional for any inmate who is involuntarily committed under Wis. Stat. § 51.20(1)(ar), which does not require a determination of dangerousness, when the inmate is involuntarily medicated based merely on a determination that the inmate is incompetent to refuse medication. All people have a "significant liberty interest in avoiding" involuntary medication. Harper, 494 U.S. at 221; Fitzgerald, 387 Wis. 2d 384, ¶13. An inmate's liberty interest "must be defined in the context of the inmate's confinement." Harper, 494 U.S. at 222. But only an "essential" or "overriding" State interest can overcome an inmate's significant liberty interest in avoiding involuntary medication. Fitzgerald, 387 Wis. 2d 384, ¶13; Sell, 539 U.S. at 178-79; Riggins, 504 U.S. at 134, 135. For example, if medication is in an inmate's "medical interest," a conclusion of dangerousness gives rise to an "essential" or "overriding" state interest that may constitutionally justify involuntary medication. Harper, 494 U.S. at 227; Riggins, 504 U.S. at 134, 135. But "[t]he mere inability" of an inmate "to express an understanding of medication or make an informed choice" is "constitutionally insufficient" to override an inmate's "'significant liberty interest'" in avoiding involuntary medication. Fitzgerald, 387 Wis. 2d 384, ¶25 (quoting Harper, 494 U.S. at 221). That is because an inmate has the same right to refuse medication whether the inmate is competent or incompetent. Lenz, 167 Wis. 2d at 73. Incompetence to refuse

27

medication alone is not an "essential" or "overriding" State interest and does not permit the State to involuntarily medicate a mentally ill inmate.

¶34 Thus, we conclude that Wis. Stat. § 51.61(1)(g)3. is facially unconstitutional for any inmate who is involuntarily committed under Wis. Stat. § 51.20(1)(ar), which does not require a determination of dangerousness, when the inmate is involuntarily medicated based merely on a determination that the inmate is incompetent to refuse medication.[15] Incompetence to refuse, alone, without any determination of dangerousness at any stage in the proceedings, is insufficient grounds for the involuntary medication of an inmate.

C. All Arguments To The Contrary Are Unavailing.

¶35 The court of appeals relied on C.S. I and Wood to conclude that Wis. Stat. § 51.61(1)(g) was facially constitutional. See C.S. III, 386 Wis. 2d 612, ¶¶13-20. That reliance was misplaced. Both cases are factually and legally distinguishable.

¶36 In C.S. I, we reviewed an involuntary commitment statute, Wis. Stat. § 51.20(1)(ar) (2013-14). C.S. I, 366 Wis. 2d 1, ¶3. C.S. argued that § 51.20(1)(ar) was facially

---

[15] Our conclusion is a narrow one. We form no conclusion as to the involuntary medication of an inmate under Wis. Stat. § 51.61(1)(g)3. pursuant to a determination that the medication is "necessary to prevent serious physical harm." Nor do we form a conclusion as to the involuntary medication of an inmate under Wis. Stat. § 51.61(1)(g)3m. pursuant to a determination that the inmate is dangerous under Wis. Stat. § 51.20(1)(a)2.e.

28

unconstitutional because it authorizes the involuntary commitment of an inmate without a conclusion of dangerousness. Id. We held that the statute is "facially constitutional because it is reasonably related to the State's legitimate interest in providing care and assistance to inmates suffering from mental illness." Id., ¶57. We said, "The State has more than a well-established and legitimate interest; it has a compelling interest in providing care and assistance to those who suffer from a mental disorder." Id., ¶44 (internal quotations omitted). That remains true. But involuntary commitment is not involuntary medication. Nor is care and assistance necessarily involuntary medication. And what justifies one does not automatically justify the other. Indeed, in C.S. I, we twice expressly limited our decision to involuntary commitment. See C.S. I, 366 Wis. 2d 1, ¶6 ("[C.S.] does not in any way challenge the constitutionality of the involuntary medication or treatment statute, Wis. Stat. § 51.61(1)(g)."); see also id., ¶42 n.24. ("[C.S.] is not challenging the constitutionality of the involuntary medication or treatment statute under Wis. Stat. § 51.61(1)(g). As such, this case does not provide an occasion for us to apply any level of scrutiny to the involuntary medication or treatment statute.").

¶37 We note that, for an inmate to be involuntarily committed under Wis. Stat. § 51.20(1)(ar), the circuit court must conclude that the inmate "is a proper subject for treatment and is in need of treatment." § 51.20(1)(ar). Accordingly, an inmate involuntarily committed under § 51.20(1)(ar) can and often does receive treatment (assuming the inmate does not refuse treatment,

29

which the inmate, of course, may refuse). But treatment is not necessarily involuntary medication.

¶38 Indeed, as corporation counsel for Winnebago County made clear at oral argument, treatment involves many things, not just involuntary medication. Wisconsin psychiatric treatment facilities for inmates who are confined to the Department of Corrections take a "wholistic approach." "There are psychiatrists, there are psychologists, there are social workers, there are nurses." "[T]here are recreational programs, there is spiritual counseling, there is exercise, there is therapy. So it's not just 'let's give someone a shot.'" Thus, C.S. I does not support a conclusion that the State's "legitimate interest in providing care and assistance to inmates suffering from mental illness" permits the State to involuntarily medicate an inmate merely because the inmate is incompetent.

¶39 The court of appeals also relied on our decision in Wood, 323 Wis. 2d 321. In that case, we reviewed and upheld the involuntary medication of committed persons who are found not guilty of a crime by reason of mental disease or defect ("NGI") and incompetent to refuse medication——without a conclusion of dangerousness——under Wis. Stat. § 971.17(3)(c) (2005-06). Id., ¶4. Wood is also readily distinguishable from this case. During a delusional episode, Wood "beat his stepfather to death with a brick." Id., ¶5. He was charged with second-degree homicide, found NGI, and committed to institutional care at Mendota Mental Health Institute. Id. When a defendant pleads NGI, the "plea admits that but for lack of mental capacity the defendant committed

30

all the essential elements of the offense charged[.]" Wis. Stat. § 971.06(1)(d) (emphasis added). Thus, when Wood was found NGI, that meant that his mental illness <u>caused</u> his violent criminal conduct.

¶40 Our conclusion in <u>Wood</u> relied heavily on the nature of NGI adjudications, not commitment and involuntary medication proceedings. "[I]nstitutions holding individuals adjudged NGI have a somewhat different interest than a prison would." <u>Wood</u>, 323 Wis. 2d 321, ¶32. "<u>In light of that overriding interest and the nature of original proceedings in which defendant is adjudged NGI</u>, we [did] not believe that a finding of present dangerousness is required when considering whether to issue an order to forcibly medicate such an individual." <u>Id.</u>, ¶33 (citing <u>Sell</u>, 539 U.S. at 181-82) (emphasis added). We also noted that "Wis. Stat. § 971.17(3), at a minimum, implicitly provides for [a conclusion of dangerousness]." <u>Id.</u>, ¶34. We reasoned that § 971.17(3)(a) "includes requirements for a determination of dangerousness at the time of commitment" and § 971.17(4)(d), "setting forth requirements for periodic reviews," "include[s] a dangerousness determination." <u>Id.</u>

¶41 Thus, <u>Wood</u> does not support a conclusion that Wis. Stat. § 51.61(1)(g)3. is facially constitutional when it permits the involuntary medication of an inmate based merely on the inmate's incompetence to refuse. The statute in this case does not require a conclusion that the inmate's mental illness caused the inmate to commit a crime. Nor does it require a conclusion of dangerousness at any time. The relevant statutes in <u>Wood</u> required both.

31

¶42 Essentially, the court of appeals relied on two factually and legally distinguishable cases to conclude that Wis. Stat. § 51.61(1)(g) was facially constitutional. It failed to recognize important differences among C.S. I, Wood, and this case. Involuntary commitment is not involuntary medication. Involuntary medication is much more invasive and must be justified by an overriding or essential interest. Fitzgerald, 387 Wis. 2d 384, ¶13; Sell, 539 U.S. at 178-79; Riggins, 504 U.S. at 134, 135. And the involuntary medication of a defendant adjudicated NGI is supported by a unique State interest in medicating a defendant whose mental illness caused violent criminal conduct, which is not present in this case.

¶43 Finally, the court of appeals concluded that "the involuntary medication and treatment of a prisoner is facially constitutional as there is a legitimate reason for the [S]tate to medicate/treat even when there is no finding of dangerousness——the general welfare of the prisoner." C.S. III, 386 Wis. 2d 612, ¶8 (emphasis added). Similarly, Winnebago County invokes its parens patriae power to argue that it may involuntarily medicate a mentally ill and incompetent inmate because it has an interest in the inmate's care and assistance. We reject such limitless assertions of the State's power to involuntarily medicate committed inmates.

¶44 The State's parens patriae power is not limitless. As we have previously said:

> The [S]tate has a legitimate interest under its parens patriae powers in providing care to its citizens

32

> who are unable to care for themselves.  The [S]tate also has authority under its police power to protect the community from any dangerous mentally ill persons.  The [S]tate's legitimate interest ceases to exist, however, if those sought to be confined are not mentally ill or if they do not pose some danger to themselves or others.

State v. Dennis H., 2002 WI 104, ¶36, 255 Wis. 2d 359, 647 N.W.2d 851 (emphases added) (internal quotations and citations omitted).  Thus, the State's parens patriae power is related to dangerousness.  The portion of Wis. Stat. § 51.61(1)(g)3. we review is not.  Once again, § 51.61(1)(g)3. permits the involuntary medication of an inmate committed under Wis. Stat. § 51.20(1)(ar) based on a determination of incompetence to refuse only.[16]  Such a determination does not even approach dangerousness.

¶45  Accordingly, the State interests asserted in this case are insufficient to save the facial unconstitutionality of Wis. Stat. § 51.61(1)(g)3.[17]

---

[16] The County asserts that under its parens patriae power it has an interest in providing "care and assistance to non-dangerous inmates who are mentally ill and in need of treatment in the form of medication, but are not competent to refuse such treatment." The United States Supreme Court has recognized that "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." Estelle v. Gamble, 429 U.S. 97, 103 (1976) (emphases added).  And we have said: "Under the theory of parens patriae it is the right and duty of the state to step in and act in what appears to be the best interests of the ward." Lenz v. L.E. Phillips Career Dev. Ctr., 167 Wis. 2d 53, 76 n.9, 482 N.W.2d 60 (1992) (emphasis added). But Wis. Stat. § 51.61(1)(g)3. does not require a determination that the inmate needs medication or that the medication is in the inmate's best interests.  It requires a determination of incompetence to refuse medication only.  § 51.61(1)(g)3.

[17] Our decision today does not place us in conflict with other jurisdictions.  There is no conflict because other cases from Alaska, Ohio, and New York require more than incompetence to refuse medication in order to justify involuntary medication.  See Myers

33

## IV. CONCLUSION

¶46 We conclude that Wis. Stat. § 51.61(1)(g)3. is facially unconstitutional for any inmate who is involuntarily committed under Wis. Stat. § 51.20(1)(ar), which does not require a determination of dangerousness, when the inmate is involuntarily medicated based merely on a determination that the inmate is incompetent to refuse medication. Incompetence to refuse medication alone is not an essential or overriding state interest and cannot justify involuntary medication. Accordingly, we reverse the court of appeals and remand to the circuit court with an order to vacate C.S.'s June 2015 order for involuntary medication and treatment.

---

v. Alaska Psychiatric Inst., 138 P.3d 238, 254 (Alaska 2006) (emphasis added) (holding that the Alaska Constitution "require[s] an independent judicial determination of an incompetent mental patient's best interests" before a court may authorize involuntary medication); Steele v. Hamilton Cty. Cmty. Mental Health Bd., 736 N.E.2d 10, 15 (Ohio 2000) (emphases added) (footnote omitted) (holding "that a court may issue an order permitting the administration of antipsychotic medication against a patient's wishes without a finding that the patient is dangerous when the court finds by clear and convincing evidence that the patient lacks the capacity to give or withhold informed consent regarding treatment, the medication is in the patient's best interest, and no less intrusive treatment will be as effective in treating the mental illness"); Rivers v. Katz, 495 N.E.2d 337, 345 (N.Y. 1986) (emphasis added) (predating Harper, and concluding that "[w]hen the medication is determined to be necessary in order to care for a patient who is unable to care for himself because of mental illness, the State's parens patriae power would be implicated"). None of these other jurisdictions have invoked parens patriae power to justify the involuntary medication of an inmate based on incompetence to refuse medication only.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶47 REBECCA GRASSL BRADLEY, J. *(dissenting).* C.S. argues Wis. Stat. § 51.61(1)(g) violates his "substantive" due process rights under the Fourteenth Amendment to the United States Constitution because that statute permits the involuntary medication of an incompetent but non-dangerous inmate. The majority agrees with C.S. I do not. The text of the Fourteenth Amendment's Due Process Clause does not protect any <u>substantive</u> rights. Although both the Privileges or Immunities Clause of the Fourteenth Amendment and Article I, Section 1 of the Wisconsin Constitution affirmatively guarantee certain individual rights, C.S. does not invoke either constitutional provision. The "substantive" due process argument C.S. does make is insupportable under the original meaning of the Fourteenth Amendment.[1] Nor has the United States Supreme Court ever recognized an inmate's "substantive" due process right to avoid the involuntary administration of medication absent a finding of dangerousness.

¶48 I also write to again encourage this court to discard the evidentiary burden of proof it applies in constitutional challenges to Wisconsin statutes. This court should instead adopt the standard employed by the United States Supreme Court, which has abandoned the requirement that parties prove statutes unconstitutional "beyond a reasonable doubt," in favor of a "plain

---

[1] See also <u>Michels v. Lyons</u>, 2019 WI 57, ¶60, 387 Wis. 2d 1, 927 N.W.2d 486 (Rebecca Grassl Bradley, J., concurring).

1

showing" or a "clear[] demonstrat[ion]" that a statute is unconstitutional.[2]  I respectfully dissent.

I

¶49 The Fourteenth Amendment to the United States Constitution, in relevant part, provides:

> All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend XIV, § 1 (emphasis added).  I acknowledge that the United States Supreme Court has interpreted the emphasized text to confer "substantive" due process rights.  See, e.g., Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997); Washington v. Harper, 494 U.S. 210, 221-22 (1990); Near v. Minnesota ex rel. Olson, 283 U.S. 697, 707 (1931) (right to free speech); Gitlow v. New York, 268 U.S. 652, 666 (1925) (same).  However, as several justices and legal scholars have explained, the Due Process Clause says nothing about substantive rights, which are expressly protected by other provisions of the Constitution.  Rather, the Due Process Clause speaks solely in terms of "process of law"——words that mean procedurally fair treatment in the justice system. "Whereas the Privileges or Immunities Clause protects a broad set of rights——including life, liberty, and property——of all citizens from improper laws, the Due Process Clause protects the life,

---

[2] See National Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 538 (2012); United States v. Morrison, 529 U.S. 598, 607 (2000).

liberty, or property of all persons from an improper <u>application</u> of an otherwise proper law." Randy E. Barnett, <u>Restoring the Lost Constitution: The Presumption of Liberty</u> 203 (2003) (emphasis in original). For this reason, Justice Antonin Scalia rightly referred to "substantive due process" as an "oxymoron"[3] an "atrocity" and "judicial usurpation."[4] Legal scholars have powerfully criticized the doctrine as a "made up atextual invention," characterizing it as the "most anti-constitutional branch of constitutional law." <u>See</u> Michael Stokes Paulsen, <u>Does the Constitution Prescribe Rules for Its Own Interpretation</u>, 103 Nw. U. L. Rev. 857, 897 (2009); Nelson Lund & John O. McGinnis, <u>Lawrence v. Texas and Judicial Hubris</u>, 102 Mich. L. Rev. 1555, 1557 (2004). "It is clear that the text of the due process clause simply will not support judicial efforts to pour substantive rather than procedural meaning into it." Robert H. Bork, <u>The Tempting of America</u>, 32 (1990).

¶50 Although the Supreme Court has read substantive rights into the Due Process Clause, Justice Clarence Thomas has emphatically rejected this interpretation:

> All of this is a legal fiction. The notion that a constitutional provision that guarantees only "process" before a person is deprived of life, liberty, or property could define the substance of those rights strains credulity for even the most casual user of words.

---

[3] <u>United States v. Carlton</u>, 512 U.S. 26, 39 (1994) (Scalia, J., concurring in judgment) ("If I thought that 'substantive due process' were a constitutional right rather than an oxymoron, I would think it violated by bait-and-switch taxation.").

[4] <u>City of Chicago v. Morales</u>, 527 U.S. 41, 85 (1999) (Scalia, J., dissenting).

3

McDonald v. City of Chicago, 561 U.S. 742, 811 (2010) (Thomas, J., concurring in part and in judgment). Identifying the proper foundation for constitutional protections is much more than a formalistic concern. Once judges endeavor to read something into the Constitution that cannot be found in its text, the law bends to the will of the judge rather than the people.

> [T]his fiction is a particularly dangerous one. The one theme that links the Court's substantive due process precedents together is their lack of a guiding principle to distinguish "fundamental" rights that warrant protection from nonfundamental rights that do not. Today's decision illustrates the point. Replaying a debate that has endured from the inception of the Court's substantive due process jurisprudence, the dissents laud the "flexibility" in this Court's substantive due process doctrine . . . while the plurality makes yet another effort to impose principled restraints on its exercise, [citing Justice Alito's opinion at 3044 – 3048]. But neither side argues that the meaning they attribute to the Due Process Clause was consistent with public understanding at the time of its ratification.
>
> . . . .
>
> [A]ny serious argument over the scope of the Due Process Clause must acknowledge that neither its text nor its history suggests that it protects the many substantive rights this Court's cases now claim it does.

Id. at 811-12 (Thomas, J. concurring in part and in judgment); see also Bork, The Tempting of America, supra ¶49, at 31 (describing the invention of substantive due process as an "obvious sham").

¶51 Returning to an interpretation of the Fourteenth Amendment that revives the original meaning of the Due Process Clause would not necessarily eliminate those fundamental rights previously recognized under that provision; rather, the source of constitutionally-protected rights would simply shift to the

4

Privileges or Immunities Clause. "When the Fourteenth Amendment was ratified, the terms privileges and immunities had an established meaning as synonyms for rights." Timbs v. Indiana, 586 U.S. ____, 139 S. Ct. 682, 692 (2019) (Thomas, J., concurring in judgment) (citation omitted; internal quotation marks omitted). Historically, people "understood the Privileges or Immunities Clause to guarantee those 'fundamental principles' 'fixed' by the Constitution[.]" Id. at 698.

¶52 Tethering the recognition of constitutional rights to the original meaning of the Constitution has the advantage of grounding rights in the text of the document rather than individual judges' inherently subjective perceptions of which rights should be accorded preferred status over others, as the amorphous substantive due process framework invites:

> I believe the original meaning of the Fourteenth Amendment offers a superior alternative, and that a return to that meaning would allow this Court to enforce the rights the Fourteenth Amendment is designed to protect with greater clarity and predictability than the substantive due process framework has so far managed.

McDonald, 561 U.S. at 812 (Thomas, J., concurring in part and in judgment). Undertaking an analysis of rights under the Privileges or Immunities Clause rather than the Due Process Clause would not unravel every precedent employing a "substantive" due process framework:

> [A]s judges, we interpret the Constitution one case or controversy at a time. The question presented in this case is not whether our entire Fourteenth Amendment jurisprudence must be preserved or revised, but only whether, and to what extent, a particular Clause in the Constitution protects the particular right at issue here. With the inquiry appropriately narrowed, I

5

believe this case presents an opportunity to reexamine, and begin the process of restoring, the meaning of the Fourteenth Amendment agreed upon by those who ratified it.

Id. at 812-13.

¶53 Although some justices appreciate the defective foundation for the "substantive" due process doctrine, they nevertheless uphold it, capitulating to its jurisprudential longevity. While the doctrine of stare decisis lends stability to the law, it should not deter the court from fulfilling its duty to say what the law is. After all, "the purpose of stare decisis 'is to make us say that what is false under proper analysis must nonetheless be held to be true, all in the interest of stability.'" State v. Grandberry, 2018 WI 29, ¶86, 380 Wis. 2d 541, 910 N.W.2d 214 (Rebecca Grassl Bradley, J., dissenting) (quoting Antonin Scalia, A Matter of Interpretation: Federal Courts and the Law 138-40 (1997)). As a primary judicial function, faithfully declaring the meaning of the Constitution overrides application of a tool that merely guides our work:

> I acknowledge the volume of precedents that have been built upon the substantive due process framework, and I further acknowledge the importance of stare decisis to the stability of our Nation's legal system. But stare decisis is only an "adjunct" of our duty as judges to decide by our best lights what the Constitution means. Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 963 (1992) (Rehnquist, C. J., concurring in judgment in part and dissenting in part). It is not "an inexorable command." Lawrence [v. Texas, 539 U.S. 558, 577 (2003)].

McDonald, 561 U.S. at 812 (Thomas, J., concurring in part and in judgment).

6

¶54 I agree with Justice Thomas that the text of the Due Process Clause does not protect any substantive rights and applying an originalist interpretation of the Fourteenth Amendment pinpoints the Privileges or Immunities Clause, rather than the Due Process Clause, as the proper source for safeguarding fundamental constitutional rights. The United States Supreme Court "'marginaliz[ed]' the Privileges or Immunities Clause in the late 19th century by defining the collection of rights covered by the Clause 'quite narrowly.'" Timbs, 586 U.S. at ____, 139 S. Ct. at 691 (Thomas, J., concurring in judgment) (quoting McDonald, 561 U.S. at 808-09 (Thomas, J., concurring in part and in judgment)). Over time, the Privileges or Immunities Clause ceased to be applied as a protection of the people's rights, leaving the clause dormant. Implanting substantive rights into purely procedural protections while ignoring their actual textual source "relegat[es] a 'clause in the constitution' 'to be without effect.'" Gamble v. United States, 587 U.S. ___, 139 S. Ct. 1960, 1989 (2019) (Thomas, J., concurring) (citing McDonald, 561 U.S. at 813, and Timbs, 586 U.S. at ___, 139 S. Ct. at 691-98). A doctrine that eviscerates an entire clause of the Constitution, effectuating substantial violence against the supreme law of the land, should be discarded.

¶55 Such a constrictive interpretation of the Privileges or Immunities Clause is incompatible with its historical meaning and such an expansive construction of the Due Process Clause is irreconcilable with its text:

> Unfortunately, the Court has doggedly adhered to these erroneous substantive-due-process precedents again and again, often to disastrous ends. See, e.g., Stenberg v. Carhart, 530 U.S. 914, 982 (2000) (Thomas, J.,

7

dissenting) ("The standard set forth in the Casey plurality has no historical or doctrinal pedigree" and "is the product of its authors' own philosophical views about abortion" with "no origins in or relationship to the Constitution").

Gamble, 587 U.S. ___, 139 S. Ct. at 1989 (Thomas, J., concurring). Disastrous ends indeed. "Substantive" due process was invented in 1856 by Chief Justice Roger Taney in order to recognize a constitutional right to slave ownership, a "right . . . nowhere to be found in the Constitution" and "that concept has been used countless times since by judges who want to write their personal beliefs into a document that, most inconveniently, does not contain those beliefs." Bork, The Tempting of America, supra ¶49, at 31. The odious origins of "substantive" due process alone should have persuaded jurists to recoil from it long ago. However, "the Supreme Court will not abandon [the doctrine], despite demonstrations of its utter illegitimacy, precisely because it is an ever flowing fount of judicial power." Id. at 32.

¶56 Justice Neil Gorsuch has signaled skepticism of the "substantive" due process doctrine as well as receptiveness toward application of an originalist view of the Privileges or Immunities Clause. See Gundy v. United States, 588 U.S. ___, 139 S. Ct. 2116, 2141 (2019) (Gorsuch, J., dissenting) ("When one legal doctrine becomes unavailable to do its intended work, the hydraulic pressures of our constitutional system sometimes shift the responsibility to different doctrines." (citing McDonald's reliance on the Due Process Clause instead of the Privileges or Immunities Clause)); see also Timbs, 586 U.S. at ___, 139 S. Ct. at 691 (Gorsuch, J., concurring) ("As an original matter, I

8

acknowledge, the appropriate vehicle for incorporation may well be the Fourteenth Amendment's Privileges or Immunities Clause, rather than, as this Court has long assumed, the Due Process Clause." (citations omitted)).

¶57 Neither the "text nor [the] history" of the Due Process Clause "suggests that it protects the many substantive rights" that the Supreme Court or this court claim it does. See McDonald, 561 U.S. at 812 (Thomas, J., concurring in part and in judgment). In this case, not a single United States Supreme Court precedent recognizes the right the majority pronounces. Therefore, I cannot agree with the majority's conclusion that Wis. Stat. § 51.61(1)(g) is unconstitutional under a "substantive" due process analysis, C.S.'s sole basis for challenging the medication order. C.S. does not invoke the Fourteenth Amendment's Privilege or Immunities Clause nor the Life, Liberty, and Pursuit of Happiness Clause of Article I, Section 1 of the Wisconsin Constitution. Unlike the Due Process Clause, each of these constitutional provisions protect substantive rights and could serve as a source of constitutional protection against the forced administration of involuntary medication absent a finding of dangerousness.

¶58 The Privileges or Immunities Clause provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const. amend XIV, § 1. "[T]he Privileges or Immunities Clause has long been understood to operate as the principal substantive limitation on a state's lawmaking powers." Ilya Shapiro and Josh Blackman, The Once and Future Privileges or Immunities Clause, 26 Geo. Mason L.

9

Rev. 1023, 1213 (2019). Because C.S. does not present "a challenge based upon the Privileges [or] Immunities Clause" this case "does not present an opportunity to reevaluate the meaning of that Clause[]" or apply it to C.S.'s asserted right to avoid the involuntary administration of medication. See Troxel v. Granville, 530 U.S. 57, 80 & n.* (Thomas, J., concurring in judgment) (citing Saenz v. Roe, 526 U.S. 489, 527-28 (1999) (Thomas, J., dissenting) (discussing the original meaning of privileges or immunities and the Court's treatment of the Clause).

¶59 The Life, Liberty, and Pursuit of Happiness Clause in Art. I, Sect 1 of the Wisconsin Constitution provides: "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed." Wis. Const. art. I, § 1. "[E]choing language from our nation's Declaration of Independence," this provision "recogniz[es] that the proper role of government——the very reason governments are instituted——is to secure our inherent rights, including liberty[.]" Porter v. State, 2018 WI 79, ¶52, 382 Wis. 2d 697, 913 N.W.2d 842 (Rebecca Grassl Bradley and Kelly, JJ., dissenting).

> While the people empower the legislature to enact laws and make policy, the constitution compels the judiciary to protect the liberty of the individual from intrusion by the majority. "[C]ourts of justice are to be considered as bulwarks of a limited Constitution against legislative encroachments . . . ." The Federalist No. 78, at 469 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Consistent with that duty, courts must earnestly scrutinize laws that are challenged for infringing constitutional rights.

10

Id., ¶53.

¶60 In C.S.'s prior case, we explained that "a valid criminal conviction and a prison sentence extinguish a defendant's right to freedom from confinement." Winnebago Cty. v. C.S., 2016 WI 1, ¶39, 366 Wis. 2d 1, 878 N.W.2d 109 (quoting Vitek v. Jones, 445 U.S. 480, 493 (1980) (citing Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 7 (1979) ("But the conviction, with all its procedural safeguards, has extinguished that liberty right: '[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty.'" (quoting Meachum v. Fano, 427 U.S. 215, 224 (1976) ("But given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system . . . .")))). In doing so, however, we expressly disclaimed any "suggesti[on] that an inmate loses all, or even most, of his or her constitutional rights while he or she is serving his or her sentence. Rather, a prison inmate 'retains those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.' Turner v. Safley, 482 U.S. 78, 95 (1987) (alteration in original) (internal quotation marks omitted) (quoting Pell v. Procunier, 417 U.S. 817, 822 (1974))." Winnebago Cty., 366 Wis. 2d 1, ¶39 (footnote and some internal citations omitted). In particular, we did not decide whether the same "legitimate penological" interest renders the involuntary medication of inmates constitutional, because C.S. did not make a

11

constitutional challenge to Wis. Stat. § 51.61(1)(g) in his prior case before this court. Winnebago Cty., 366 Wis. 2d 1, ¶48.

¶61 Because C.S. did not argue that the involuntary administration of medication violates his rights under the Life, Liberty, and Pursuit of Happiness Clause in Art. I, Sec. 1 of the Wisconsin Constitution, absent a finding of dangerousness, this case does not present an opportunity to undertake an analysis of how an inmate's curtailed liberty interest may impact the constitutionality of Wis. Stat. § 51.61(1)(g) under the Wisconsin Constitution.[5]

¶62 Rather than applying the fiction of "substantive" due process to C.S.'s claims, "I would follow the text of the Constitution, which sets forth certain substantive rights that cannot be taken away, and adds, beyond that, a right to due process when life, liberty, or property is to be taken away." United States v. Carlton, 512 U.S. 26, 42 (1994) (Scalia, J., concurring in judgment). C.S. grounds his claim solely in "substantive" due process and does not advance any argument that he was deprived of due process of law. No United States Supreme Court case recognizes an inmate's "substantive" due process right to avoid the involuntary administration of medication absent a finding of dangerousness. Accordingly, C.S.'s challenge to the

---

[5] C.S. references Article I, Section 1 of the Wisconsin Constitution only once, tying it to substantive due process: "An individual's substantive due process rights are rooted in the Fourteenth Amendment to the United States Constitution, and Article I, § 1 of the Wisconsin Constitution."

12

constitutionality of Wis. Stat. § 51.61(1)(g) on this basis should fail.

## II

¶63 C.S. urges the court to abandon the standard of review applicable to his claim and instead align our law with the United States Supreme Court's adopted standard. For many years, this court has imposed a "heavy" burden on any party challenging the constitutionality of a statute; "the court presumes the legislation is constitutional, engages in every attempt to uphold it, and in a facial challenge, requires a party challenging a law to prove it 'is unconstitutional beyond a reasonable doubt.'" Mayo v. Wisconsin Injured Patients and Families Comp. Fund., 2018 WI 78, ¶68, 383 Wis. 2d 1, 914 N.W.2d 678 (Rebecca Grassl Bradley, J., concurring) (citing State v. Smith, 2010 WI 16, ¶8, 323 Wis. 2d 377, 780 N.W.2d 90). "To succeed in a facial challenge, a party must also show the law cannot be enforced under any circumstances." Id. (citing State v. Wood, 2010 WI 17, ¶13, 323 Wis. 2d 321, 780 N.W.2d 63). In Mayo, I "question[ed] the court's continued adherence to an evidentiary burden of proof when deciding a statute's constitutionality[,]" identifying several flaws intrinsic to the standard while tracing its origins and outlining its evolution in Wisconsin cases. See Mayo, 383 Wis. 2d 1, ¶¶68-97 (Rebecca Grassl Bradley, J., concurring). I will not repeat that exhaustive treatment here but will re-emphasize some pertinent points.

¶64 As a preliminary matter, "a statute either comports with the constitution or it does not." Id. at ¶69. "[I]mposing a

13

burden of proof heavily weighted in favor of the legislature on matters of constitutional interpretation" risks "abdication of our core judicial powers to exercise impartial judgment" by according "almost unfettered deference to the legislature." Id. (citing Gabler v. Crime Victims Rights Board, 2017 WI 67, ¶37, 376 Wis. 2d 147, 897 N.W.2d 384). More than a century ago, Daniel Webster suggested the legislature may pass a law of questionable constitutionality, confident the judiciary will provide a check on the actions of a co-equal branch of government; however, if "its unconstitutionality is doubtful," the court will uphold the law, at the expense of the people governed by it. James B. Thayer, The Origin and Scope of the American Doctrine of Constitutional Law, 7 Harv. L. Rev. 129, 146 (1893). "While the courts are deferring to the legislature, the legislature in turn is deferring to the courts. By this ruse, any scrutiny of legislation to ensure it is within the just powers of a legislature is avoided." Randy E. Barnett, Our Republican Constitution: Securing the Liberty and Sovereignty of We the People 128 (2016). Under this paradigm, no one assumes responsibility for verifying the constitutionality of a law, but the people are nonetheless bound by it.

¶65 The United States Supreme Court has abandoned the beyond-a-reasonable-doubt standard for assessing the constitutionality of statutory law. Edward C. Dawson, Adjusting the Presumption of Constitutionality Based on Margin of Statutory Passage, 16 U. Pa. J. Const. L. 97, 109 (2013) ("[T]he 'beyond a [reasonable or] rational doubt' formulation has disappeared."). Instead, the Court will strike down a statute upon a "plain

showing" of its unconstitutionality, United States v. Morrison, 529 U.S. 598, 607 (2000), or if its unconstitutionality is "clearly demonstrated.'" National Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 538 (2012) (quoting United States v. Harris, 106 U.S. 629, 635 (1883)). Previously, this court has not acknowledged the United States Supreme Court's reformulation of the standard to be applied in challenges to the constitutionality of a statute, but in this case, the majority expressly "decline[s] to adopt a different standard." Majority op., ¶14 n.7.

¶66 Although the majority in this case recites the presumption of constitutionality for Wis. Stat. § 51.61(1)(g) as well as the burden on C.S. to establish the statute's unconstitutionality beyond a reasonable doubt, the majority appears to apply a different standard. Specifically, the majority seems to employ a weaker presumption while flipping the burden onto the government to justify its encroachment on an inmate's liberty. The majority declares "[a]ll people have a 'significant liberty interest in avoiding' involuntary medication[]" and "only an 'essential' or 'overriding' state interest can overcome an inmate's significant liberty interest in avoiding involuntary medication." Majority op., ¶33. The majority's expression of the law it applies in this case certainly sounds like a presumption of liberty afforded the challenger, with the burden to overcome it falling on the government. See Randy E. Barnett, Restoring the Lost Constitution: The Presumption of Liberty 275 (2003) (arguing that courts should change the standard from a "presumption of constitutionality" to a "presumption of liberty" wherein the

government, not the challenger, must prove the "necessity and propriety of its restrictions on liberty").

¶67 Applying a non-evidentiary standard would relieve courts from the "absurd position" in which the beyond a reasonable doubt standard places them: "We could determine a law is more likely than not unconstitutional, and we would still uphold it. We could even conclude a party has shown clearly and convincingly that a law is unconstitutional, and still we would sustain it." Mayo, 383 Wis. 2d 1, ¶84 (Rebecca Grassl Bradley, J., concurring) (footnotes omitted). Requiring instead a "plain showing" or "clear[] demonstrat[ion]" of unconstitutionality would restore "the constitutional roles of the judiciary and the legislature" as well as "the hierarchy of laws" under which the Constitution reigns supreme over statutory law. Id.

> The Constitution is either a superior, paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the legislature shall please to alter it. If the former part of the alternative be true, then a legislative act contrary to the Constitution is not law: if the latter part be true, then written Constitutions are absurd attempts on the part of the people, to limit a power, in its own nature illimitable.

Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803). "Judicial respect for its co-equal branch, the legislature, cannot amount to surrender of judicial power or abdication of judicial duty." Mayo, 383 Wis. 2d 1, ¶84 (Rebecca Grassl Bradley, J., concurring).

¶68 Among "the Framers' chief concerns" was preventing the legislature from being "the 'constitutional judges of their own powers.'" Id., ¶86 (citing David M. Burke, The Presumption of Constitutionality Doctrine and the Rehnquist Court: A Lethal

16

Combination for Individual Liberty, 18 Harv. J. L. & Pub. Pol'y 73, 90 (1994) (citing The Federalist No. 78, supra ¶59, at 467 (Alexander Hamilton)). Requiring those challenging the constitutionality of a legislative enactment to convince a court beyond a reasonable doubt accords such deference to legislators as to hand them "both the pen and the gavel over their own laws" thereby risking "the constitutional overreach of legislative power." Id., ¶87 (citing Burke, supra, at 90).

¶69 While the people constitutionally bestow a powerful pen on the legislature, the people give the gavel to the judiciary to check the exercise of legislative power should it exceed its constitutional boundaries. The adoption of the beyond-a-reasonable-doubt standard for constitutional challenges to legislative enactments may have been born of a judicial restraint that properly respects the people's representatives as the policy-makers, but if statutory law fails to comport with constitutional limits, it is the judiciary's duty to say so. "Without this, all the reservations of particular rights or privileges would amount to nothing." The Federalist No. 78, supra ¶59, at 466 (Alexander Hamilton). "If the judiciary passively permits another branch to arrogate judicial power unto itself, however estimable the professed purpose for asserting this prerogative, the people inevitably suffer. . . . [T]he people lose their independent arbiters of the law, the balance of powers tips, and the republican form of government is lost." Gabler, 376 Wis. 2d 147, ¶39. Adopting the United States Supreme Court's standard requiring those challenging the constitutionality of a statute to make a

17

"plain showing" or a "clear[] demonstrat[ion]" would respect "the legislature's constitutional lawmaking function" while ensuring judges fulfill their duty as the "bulwarks of a limited Constitution against legislative encroachments[.]" Mayo, 383 Wis. 2d 1, ¶90 (quoting The Federalist No. 78, supra ¶59, at 469 (Alexander Hamilton)).

III

¶70 "Substantive" due process is a judicial invention with no mooring in the text of the Constitution. The Due Process Clause plainly applies to the procedural mechanisms by which the government may constitutionally "deprive any person of life, liberty, or property" but does not protect substantive rights. Because C.S.'s claim is grounded in "substantive" due process, I cannot join the majority's conclusion that Wis. Stat. § 51.61(1)(g) violates the Due Process Clause. The United States Supreme Court has never recognized an inmate's substantive due process right to avoid the involuntary administration of medication absent a finding of dangerousness. While liberty interests may be vindicated under the Privileges or Immunities Clause or Art. I, § 1 of the Wisconsin Constitution, C.S. did not invoke either provision. I respectfully dissent.

¶71 BRIAN HAGEDORN, J.   *(dissenting).*   The majority today creates a new constitutional right not found in the text of the Constitution.  It announces a substantive due process right for prisoners who a court has determined are incapable of making decisions regarding medication to nonetheless refuse that medication unless they have been found dangerous by a court.  When wading in the waters of substantive due process, we are toying with the constitutional authority the people have given us.  We're used to doing this sort of thing now, but we shouldn't be.  Each new judicial expansion of substantive due process risks further degradation of the constitution's command that policy decisions are to be made by the other branches of government, not us.

¶72 C.S. brings a specific and narrow argument:  whether it is unconstitutional, without a determination of dangerousness, to involuntarily medicate a prisoner who a court has found not competent to refuse medication.  The majority does not purport to undertake an original public meaning analysis of any provision of the United States or Wisconsin Constitutions.  We are acting as a lower appellate court interpreting and applying United States Supreme Court precedent, and relatedly, our decisions applying that precedent.  Those cases establish that while there is a substantive due process liberty interest in being free from unwanted medication, the legal test applicable to prison regulations impacting constitutional rights is whether the regulation is reasonably related to a legitimate penological interest, a form of rational basis review.  We have previously indicated that the state has a legitimate interest in caring for

1

the well-being of inmates who cannot care for themselves. Following these guideposts, the statutory provision allowing the state to involuntarily medicate prisoners for whom medication is in their best interest who are found incapable of making a decision regarding medication does not, under the governing precedent, violate the Due Process Clause of the Fourteenth Amendment.

¶73 While the relevant cases haven't changed in recent years, somehow our reading of them has. The majority applies a form of heightened scrutiny ordinarily applicable outside the prison context, and concludes that a determination of dangerousness is required. In so doing, the majority disregards the constitutional standard for prison regulations impacting constitutionally protected liberty interests, creates its own standard, and uses that standard to announce a new substantive due process right. If a new standard is warranted, it is up to the United States Supreme Court to create it; we are not permitted to disregard what the Supreme Court has said any more than the court of appeals may disregard what we say. Though the state's power in this area is not to be taken lightly, the care of mentally ill prisoners found incapable of rendering informed consent regarding medication is, under the governing law, a policy choice the people have reserved to their elected representatives. I respectfully dissent.

I

¶74 Today's decision is based on the Fourteenth Amendment to the United States Constitution, which prohibits states from

2

depriving citizens of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. A student reading the constitutional text would no doubt be surprised to find that this language has morphed into something entirely unrelated to what it actually says. Rather than ensuring a fair process before being deprived of these rights, the Due Process Clause has been transformed into the storehouse for a seemingly unlimited supply of judicially created substantive protections. See McDonald v. City of Chicago, 561 U.S. 742, 811 (2010) (Thomas, J., concurring in part and concurring in judgment) ("The notion that a constitutional provision that guarantees only 'process' before a person is deprived of life, liberty, or property could define the substance of those rights strains credulity for even the most casual user of words."); see also Sessions v. Dimaya, 138 S. Ct. 1204, 1244 (2018) (Thomas, J., dissenting) ("This Court also has a bad habit of invoking the Due Process Clause to constitutionalize rules that were traditionally left to the democratic process."). The Due Process Clause is now read by courts as an invitation to the judiciary to define what we think liberty is and how important we think a given liberty interest ought to be. Then we conduct a form of "balancing" that interest against the government's interests, and declare a misbalanced law an unconstitutional one.

¶75 We should not miss what's really happening here. With no text as our guide——which distinguishes this from enumerated constitutional liberties like the freedom of speech and religion——we have assumed the incredible power to make what are

3

quintessentially policy decisions, and to call those decisions constitutional law. If the Constitution itself tells us to do this, then we must. But count me skeptical. This is a dangerous business. The judiciary is, at best, treading on the thinnest of authority when striking down an act of the legislature on the grounds of substantive due process.

¶76 That said, this court has an obligation to follow United States Supreme Court decisions interpreting the United States Constitution. The federal Constitution states that it is the "supreme" law of the land, and that the power to decide cases based on the Constitution is vested in a "supreme" court. U.S. Const. art. VI; id. art. III, § 1. When the highest court authoritatively construes the highest law, state courts like ours must follow. Therefore, even though I have grave concerns with the compatibility of the original public meaning of the Fourteenth Amendment's Due Process Clause and current doctrine interpreting it, I believe I must faithfully apply those decisions.


II

¶77 Medicating someone against his will is, by any definition, a "substantial interference with that person's liberty." Washington v. Harper, 494 U.S. 210, 229 (1990). Thus, the Supreme Court has said avoiding unwanted medication is a substantive liberty interest protected by the Due Process Clause. The real question is under what circumstances the state may

4

overcome that interest to involuntarily medicate a person. Two types of cases frame the relevant principles.

¶78 One set of cases involves involuntarily medicating criminal defendants to render them competent to stand trial. These unique cases require the court to balance the due process right not to be involuntarily medicated with the due process right to be tried while competent. See Medina v. California, 505 U.S. 437, 453 (1992); Riggins v. Nevada, 504 U.S. 127, 139-40 (1992) (Kennedy, J., concurring in judgment) ("Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so."). In these circumstances, the Supreme Court has applied a much more exacting level of scrutiny. The Court has required an "essential" or "overriding" state interest to justify this significant government encroachment on a person's liberty. This is the teaching of Riggins, Sell v. United States, 539 U.S. 166, 178-79 (2003), and our own decision in State v. Fitzgerald, 2019 WI 69, ¶13, 387 Wis. 2d 384, 929 N.W.2d 165.

¶79 But while the state interest must be essential or overriding as an ordinary matter, a different analytical framework applies in the prison context. States are given much greater latitude in governing prisons due to their different challenges and goals. Constitutional rights of all kinds are restricted in prison in a way that would be unthinkable for those outside of

5

prison. The majority elides the difference between these types of cases. It incorporates standards from non-prison cases, applies the incorrect legal test, and therefore reaches an incorrect legal conclusion.

¶80 The seminal case governing prison regulations impacting constitutional rights is Turner v. Safley, 482 U.S. 78 (1987). In Turner, two constitutional complaints spurred the litigation——the first over restrictions on inmate-to-inmate correspondence, and the second over restrictions on inmate marriages. The lower courts applied a strict scrutiny analysis and struck down both restrictions. Id. at 83. The Supreme Court reversed.

¶81 First, the Court recognized that prisoners retain constitutional rights, and courts must discharge their duty to protect those rights. Id. at 84. Even so, "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." Id. (quoted source omitted). Running a prison is "peculiarly within the province of the legislative and executive branches of government. . . . [A]nd separation of powers concerns counsel a policy of judicial restraint." Id. at 84-85. Reviewing prior cases, the Court observed that it had not clarified the appropriate standard of review. Id. at 85-89. Its task, then, was to formulate "a standard of review for prisoners' constitutional claims that is responsive both to the 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights.'" Id. at 85 (alteration in original) (quoted source omitted).

6

¶82 Drawing on precedent, the Court defined the proper legal test for prison cases: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. at 89. This deferential standard was necessary to ensure prison administrators make the difficult institutional decisions, not the courts. Id. The Court explained that a heightened scrutiny analysis would be ill-suited for the unique challenges of operating a prison. Id. Exacting judicial oversight "would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand." Id. Inevitably, this heightened scrutiny would result in courts becoming "the primary arbiters of what constitutes the best solution to every administrative problem, thereby 'unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration.'" Id. (alteration in original) (quoted source omitted).

¶83 With the threshold test established, the Court outlined four factors to assist in determining the reasonableness of a prison regulation. Id. at 89-91. First, the prison regulation must have a "valid, rational connection" to the legitimate government interest proffered by the state, and it must operate in a neutral fashion. Id. at 89-90. Second, keeping the appropriate "measure of judicial deference" in mind, courts must look to whether alternative means of exercising the constitutional right remain available. Id. at 90. The third factor is the effect

7

accommodation of the asserted constitutional right will have on guards, other inmates, and allocation of prison resources. Id. Courts should be "particularly deferential" when the policy has ripple effects on fellow inmates or prison staff. Id. The final factor is the absence of ready alternatives. Id. at 90-91.

¶84 The Court then applied this test and these factors and concluded that the rule barring correspondence between inmates bore the necessary reasonable relationship to a legitimate penological interest, while the marriage restriction did not. Id. at 91.

¶85 In a case released just eight days later, the Supreme Court rejected a First Amendment religious freedom challenge to certain restrictions affecting Muslim prisoners. O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987). The Court reaffirmed and applied the test from Turner, and discussed the valid penological objectives of "deterrence of crime, rehabilitation of prisoners, and institutional security." Estate of Shabazz, 482 U.S. at 348.

¶86 But perhaps involuntary administration of medication to prisoners should be governed under a different standard? The Supreme Court had occasion to answer precisely this question in Harper.

¶87 Prior to the case reaching the Supreme Court, the Washington Supreme Court thought the Turner test applied only when the First Amendment was invoked. Harper, 494 U.S. at 223. Incorrect, the Supreme Court held. Id. The Court reaffirmed that "the proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional

8

rights is to ask whether the regulation is 'reasonably related to legitimate penological interests.'" Id. (quoting Turner, 482 U.S. at 89). This standard, the Court explained, "applies to all circumstances" and "in all cases in which a prisoner asserts that a prison regulation violates the Constitution." Id. at 224. It applies "even when the constitutional right claimed to have been infringed is fundamental, and the State under other circumstances would have been required to satisfy a more rigorous standard of review." Id. at 223. For "refusing to apply the standard of reasonableness," the Washington Supreme Court "erred." Id. The Court then applied the relevant Turner factors and concluded that the prison policy for involuntary medication complied with due process by rationally "furthering the State's legitimate objectives." Id. at 224-27.

¶88 In failing to apply the law the United States Supreme Court says to apply, this court errs as well. It has not escaped the attention of courts that plainly unconstitutional restrictions outside the prison context may nonetheless bear the requisite reasonable relationship to a legitimate penological interest in the prison context.[1] Prison is different; the Supreme Court and lower courts around the country have repeatedly said so. The Turner test is the law governing prison regulations impacting

---

[1] See, e.g., Fraise v. Terhune, 283 F.3d 506, 515 n.5 (3d Cir. 2002) ("Turner discussed five prior Supreme Court cases involving inmate constitutional claims, and in all of those cases the challenged prison regulation would have been plainly unconstitutional outside the prison context." (discussing Turner v. Safley, 482 U.S. 78 (1987))).

constitutional rights, and it must be followed.[2]  Involuntary medication impacts the constitutional right to due process, and Harper has left no doubt as to the proper standard of review for the precise issue before us.

¶89 The argument that subsequent cases have modified this test does not withstand scrutiny.  In a 2005 decision regarding racial classifications in prison, the Supreme Court discussed the broad and varied areas where the Turner test has been held to

---

[2] Turner does not apply, of course, if other statutory protections are in place.  See Holt v. Hobbs, 574 U.S. 352, 355 (2015) (not applying the Turner test in a case covered by the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc to 2000cc-5 (2012)).  But general use of the Turner test by the Supreme Court continues unabated.  Subsequent Supreme Court cases affirming and applying the Turner test include Florence v. Board of Chosen Freeholders, 566 U.S. 318 (2012) (applying the Turner test to correctional facility policies authorizing strip searches and body-cavity inspections of arrested individuals prior to entering the general population of a jail); Beard v. Banks, 548 U.S. 521 (2006) (applying the Turner test and affirming a prison policy denying newspapers, magazines, and photographs to certain inmates); Overton v. Bazzetta, 539 U.S. 126 (2003) (applying the Turner test to prison regulations restricting visiting privileges); and Thornburgh v. Abbott, 490 U.S. 401 (1989) (applying the Turner test to prison regulations restricting incoming publications).

The federal courts of appeal have also regularly applied Turner to prison regulations right up to the present day.  See, e.g., Greenhill v. Clarke, 944 F.3d 243 (4th Cir. 2019) (applying the Turner test to an inmate's Free Exercise Clause claim); Brown v. Collier, 929 F.3d 218 (5th Cir. 2019) (same); Nigl v. Litscher, 940 F.3d 329 (7th Cir. 2019), petition for cert. filed (U.S. Mar. 6, 2020) (No. 19-1618) (applying the Turner test to the denial of a prisoner's request to marry); Hanrahan v. Mohr, 905 F.3d 947 (6th Cir. 2018) (applying the Turner test to prison restrictions on in-person media interviews with certain prisoners); Crime Justice & Am., Inc. v. Honea, 876 F.3d 966 (9th Cir. 2017) (applying the Turner test to county jail's commercial mail policy); Daker v. Warren, 660 F. App'x 737 (11th Cir. 2016) (applying the Turner test to prison policy banning hardcover books).

10

apply. Johnson v. California, 543 U.S. 499, 510 (2005). The Court in Johnson, although making an exception for racial classifications, affirmed application of the Turner test in other areas. Among the multitude of applications noted was an explicit reference to Harper's use of the Turner test to adjudicate the due process issues involved in involuntary medication of mentally ill prisoners. 543 U.S. at 510. This decision came after both Riggins and Sell were decided. The Turner test was the law governing involuntary administration of medication to inmates, and it remains so today.

¶90 C.S.'s main, and really only, argument in this case is that Harper says dangerousness is required. But this is certainly a misreading of Harper. The Court did conclude that the prison policy at issue, "given the requirements of the prison environment," permitted the state to involuntarily medicate an inmate with a serious mental illness "if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." 494 U.S. at 227. But these strictures repeat what the at-issue prison policy required, not necessarily what due process requires. Id. Due process was accorded because the state's policy afforded sufficient protections to Harper and constituted a reasonable relationship to a legitimate penological interest.[3]

---

[3] Beyond the dangerousness element, Wisconsin's approach provides that any report accompanying a motion for involuntary administration of medication must "include a statement signed by a licensed physician that asserts that the subject individual needs medication or treatment and that the individual is not competent to refuse medication or treatment, based on an examination of the individual by a licensed physician." Wis. Stat. § 51.61(1)(g)3. (2017-18) (emphasis added).

11

Id. at 225-26. In fact, Harper's "main contention" before the Court was that involuntary medication would be permissible only if the State found him incompetent, followed by "court approval of the treatment using a 'substituted judgment' standard." Id. at 226. The Court rejected this "suggested rule" because it took "no account of the legitimate governmental interest in treating him where medically appropriate for the purpose of reducing the danger he poses." Id. In sum, the Harper Court never isolated dangerousness as a necessary requirement to satisfy due process; reducing the risk of danger was a sufficient penological interest, but not a necessary one.

¶91 Prior to today, this court has read the same cases and correctly concluded that due process does not require a determination of dangerousness.

¶92 In 2010, after reviewing the same United States Supreme Court cases discussed by the majority in this case, this court concluded that dangerousness was not a necessary requirement to order involuntary medication of an individual committed after being found not guilty of a crime by reason of mental disease or defect (NGI). State v. Wood, 2010 WI 17, ¶4, 323 Wis. 2d 321, 780 N.W.2d 63. In Wood, we explained that the state had at least two interests in medicating NGI individuals: first, its interest in "treating the underlying mental illness in order to prevent more criminal behavior and prepare the individual for conditional release and for eventual release from the commitment," and second,

---

All subsequent references to the Wisconsin Statutes are to the 2017-18 version.

12

its interest in maintaining institutional safety, security, and functionality. Id., ¶32. This court determined each interest was sufficient to sustain an involuntary medication order. See id., ¶33 (citing Sell for the proposition that "a finding of dangerousness is not required where the relevant state interest is unrelated to institutional safety and security").

¶93 In 2016, we had the opportunity to evaluate the involuntary commitment of the same inmate before us today, where he similarly argued that his commitment violated substantive due process without a determination of dangerousness. Winnebago County v. Christopher S. (C.S. I), 2016 WI 1, 366 Wis. 2d 1, 878 N.W.2d 109. We disagreed. Reviewing the relevant cases, especially Harper and Turner, we explained that a prisoner's rights, including the significant liberty interest in avoiding involuntary administration of antipsychotic drugs, "must be viewed in light of his or her 'status as an inmate' and 'the legitimate penological objectives of the corrections system.'" C.S. I, 366 Wis. 2d 1, ¶¶36-42 (quoting Turner, 482 U.S. at 95). We concluded that rational basis review applied to involuntary commitments of prisoners. Id., ¶42. And applying that test, the statutory scheme allowing involuntary commitment without a determination of dangerousness was "facially constitutional because it is reasonably related to the State's legitimate interest in providing care and assistance to inmates suffering from mental illness." Id., ¶57.

¶94 Following the Supreme Court's direction, as we must, we are duty-bound to apply the test the United States Supreme Court

13

has established to govern prison regulations impacting constitutional rights. The test is not whether a determination of dangerousness has been made, but whether the statutory provisions allowing involuntary medication of inmates are reasonably related to a legitimate penological interest.

III

¶95 To conduct the analysis, we need to put this case in its relevant statutory context.[4] As a default rule, inmates who have been committed "have the right to exercise informed consent with regard to all medication and treatment." Wis. Stat. § 51.61(1)(g)3. But this rule comes with two narrow exceptions.

¶96 The first exception is when "a situation exists in which the medication or treatment is necessary to prevent serious physical harm to the individual or others." Id. To highlight, this exception is narrow, triggered only when "necessary" to prevent harm that is both "serious" and "physical." By definition, modest physical harm would not satisfy; neither would serious mental or emotional harm.

¶97 Taking the statutory text at its word, an inmate who would suffer immense mental and emotional anguish due to a bout of schizophrenic hallucinations would——assuming no serious physical harm was in play——not be covered within the exception. This is

---

[4] We review the constitutionality of a statute de novo. Winnebago County v. Christopher S. (C.S. I), 2016 WI 1, ¶33, 366 Wis. 2d 1, 878 N.W.2d 109. When a statute has been challenged as unconstitutional on its face, the challenger is required to establish that the law cannot be enforced "under any circumstances." Id., ¶34.

true even if the inmate, due to a schizophrenic episode, was found by a court to be incapable of making an informed decision regarding whether medication would help.

¶98 But the legislature also created a second exception to the default informed consent rule: when a court determines "that the individual is not competent to refuse medication or treatment." Id. An individual is not competent to refuse when a court determines either that he is (1) "incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives"; or (2) "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness, developmental disability, alcoholism or drug dependence in order to make an informed choice as to whether to accept or refuse medication or treatment." § 51.61(1)(g)4. In other words, a court must determine the inmate simply does not have the capacity to express an understanding of the underlying information necessary to exercise informed consent, or the inmate lacks the capacity to apply the information in a way that fulsomely constitutes informed consent. In layman's terms, this is a finding that the inmate does not have the ability or power to meaningfully exercise informed consent.

¶99 Applying the proper test, the question is whether involuntarily medicating an inmate who a neutral arbiter (the court) has concluded lacks the ability or power to exercise informed consent is reasonably related to a legitimate penological interest. The Turner factors inform our analysis.

¶100 First, the policy must have a valid, rational connection to the legitimate government interest proffered by the state, and operate in a neutral fashion. Turner, 482 U.S. at 89-90. The state interest put forward here is the "care and assistance to non-dangerous inmates who are mentally ill and in need of treatment in the form of medication, but are not competent to refuse such treatment." Without question, the state has a legitimate interest in caring for those who are unable to care for themselves. This is known as the parens patriae power.[5] Significant swaths of state government are devoted to protecting those who, by reason of age, illness, or incapacity, are unable to care for themselves.

¶101 And as relevant to this case, the prison environment uniquely raises these concerns. As the Supreme Court has

---

[5] See State v. Dennis H., 2002 WI 104, ¶36, 255 Wis. 2d 359, 647 N.W.2d 851 ("The state has a legitimate interest under its parens patriae powers in providing care to its citizens who are unable to care for themselves." (quoting Addington v. Texas, 441 U.S. 418, 426 (1979))); Lenz v. L.E. Phillips Career Dev. Ctr., 167 Wis. 2d 53, 76 n.9, 482 N.W.2d 60 (1992) ("Parens patriae literally means 'parent of the country' and refers to the role of the state as guardian of persons under legal disabilities, such as juveniles or incompetent persons. Under the theory of parens patriae it is the right and duty of the state to step in and act in what appears to be the best interests of the ward." (citation omitted)).

The majority suggests that invoking parens patriae power here amounts to a "limitless" assertion of the state's power. Majority op., ¶¶43-44. Quite the contrary. The majority misses the principle that prison is different, and the legitimate purposes that might support prison regulations do not automatically equate to the compelling interest and narrow tailoring that might be required to justify the same action outside the prison context. For example, upholding a prison regulation banning certain books does not mean the government may ban books outside of prison. The same logic applies here.

16

recognized, "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." Estelle v. Gamble, 429 U.S. 97, 103 (1976). Government has a constitutional "obligation to provide medical care for those whom it is punishing by incarceration." Id.; see also Harper, 494 U.S. at 225 ("We confront here the State's obligations, not just its interests. The State has undertaken the obligation to provide prisoners with medical treatment consistent not only with their own medical interests, but also with the needs of the institution.").

¶102 Providing needed medical care to those the state has an obligation to care for, and who are unable to render informed consent regarding their own care, constitutes a legitimate penological interest. Helping rehabilitate and stabilize a prisoner's mental health when he is unable to help himself is part of the rehabilitative aims of prison and constitutes a legitimate penological interest. The policy here is certainly rationally related to these legitimate interests.

¶103 This is precisely the same reasoning we used just a few terms ago in C.S. I, 366 Wis. 2d 1. Caring for those unable to care for themselves is a legitimate exercise of government power. Id., ¶44. And in the prison context, we determined this interest was "particularly strong." Id., ¶45. Looking again to Harper, we explained that caring for inmates under custody of the state "is not just an interest; it is an obligation." Id. (citing Harper, 494 U.S. at 225). Therefore, we concluded that involuntarily committing prisoners is rationally related to a legitimate state

17

interest: "providing care and assistance to those inmates who need treatment because they are suffering from a mental illness." Id., ¶46.[6]

¶104 The second Turner factor is whether alternative means of exercising the constitutional right remain available to the inmate.[7] 482 U.S. at 90. The statutory design in Wisconsin gives an inmate the right to refuse medication, thus protecting the constitutional liberty interest at stake. Wis. Stat. § 51.61(1)(g)1. The state is not assuming the power to override personal medical decisions that prison personnel simply disagree with. The narrow power asserted here kicks in only when inmates

---

[6] In addition to contradicting C.S. I, the court's decision today also places us in conflict with courts around the country that have concluded involuntary medication may be justified through the state's parens patriae power. The majority's determination otherwise is an outlier. See, e.g., Myers v. Alaska Psychiatric Inst., 138 P.3d 238, 249 (Alaska 2006) ("We readily agree that the state's parens patriae obligation does give it a compelling interest in administering psychotropic medication to unwilling mental patients in some situations."); In re Qawi, 81 P.3d 224, 231-32 (Cal. 2004) ("In California, parens patrie may be used only to impose unwanted medical treatment on an adult when the adult has been adjudged incompetent."); Rivers v. Katz, 495 N.E.2d 337, 343 (N.Y. 1986) ("Therefore, the sine qua non for the state's use of its parens patriae power as justification for the forceful administration of mind-affecting drugs is a determination that the individual to whom the drugs are to be administered lacks the capacity to decide for himself whether he should take the drugs[.]"); Steele v. Hamilton Cty. Cmty. Mental Health Bd., 736 N.E.2d 10, 18-21 (Ohio 2000) ("A second state interest recognized by many courts to be sufficiently compelling to override a mentally ill patient's decision to refuse antipsychotic medication is the state's parens patriae power.").

[7] The court in Harper declined to consider this factor, apparently presuming it to be inapplicable. Washington v. Harper, 494 U.S. 210, 224-25 (1990). I address this factor for the sake of completeness.

18

cannot make the decision for themselves——a decision made by a neutral court, not state officials.[8]  § 51.61(1)(g)3.

¶105 The third Turner factor is the effect accommodation of the asserted constitutional right would have on guards, other inmates, and allocation of prison resources. 482 U.S. at 90.  This factor also weighs in favor of the constitutionality of the legislature's policy choice.  Inmates whose mental health disorders are left uncontrolled could make cooperation, community activities, and other necessary treatments very difficult.  An inmate incapable of making a decision on medication could result in personal distress that might require additional supervision resources, or require different living arrangements.  An inmate who for example raises only a possible, rather than "serious," risk of physical harm to himself or others would no doubt need special staff consideration, medical supervision, separation from other inmates, and other related expenditures that risk disrupting prison order, security, and inmate well-being.  It is not difficult to see how the intransigence of a mentally ill inmate incapable of making medication decisions could lead to ripple effects on fellow inmates or prison staff.

¶106 The final Turner factor is the absence of alternatives. 482 U.S. at 90-91.  And once again, this factor weighs in favor of the state's policy choice here.  The majority's decision has the

---

[8] As noted above, Wis. Stat. § 51.61(1)(g)3. also provides the power to override the consent of an inmate when a court finds doing so is necessary to prevent serious risk of physical harm to the inmate or others.  This portion of the statute is not an issue in this case.

19

effect of recognizing and affirming the medical decision of someone who a court has found incapable of making that decision. This means prison officials are helpless to help someone who, acting in his incapacity, remains steadfastly opposed to medication. The only statutory out to this is the very limited situation where overriding the incompetent inmate's decision is "necessary to prevent serious physical harm." Wis. Stat. § 51.61(1)(g)3. In the majority's view, the Constitution requires the state to let prisoners suffer——physically, mentally, and emotionally——through serious mental health issues so long as the inmate won't seriously hurt himself or others. The legislature has seen fit to provide the procedural protection of an independent arbiter, a court, to ensure a prisoner's rights are fairly heard and fairly respected. Id. I'm unsure what else the state is supposed to do to help suffering, but incompetent, prisoners in its care.

¶107 Reasoning through these factors, I conclude that the state's limited ability to involuntarily medicate inmates in its care, whose treatment is in their medical interest and who a court has found are incapable of making that decision for themselves, is reasonably related to a legitimate penological interest. C.S.'s claim that a showing of dangerousness is required is incorrect under the governing precedent, and the state's policy choices should stand.

¶108 The majority's contrary conclusion is predominantly a product of its application of the wrong constitutional standard. The majority glosses over the difference between protection of constitutional rights in the prison context, and protection of

20

those rights outside the prison context. This misstep leads to application of a form of heightened scrutiny, rather than the rational basis-like Turner test that the Supreme Court applied in Harper.

¶109 Applying a heightened-scrutiny framework risks the very judicial interference in prison administration the Court in Turner warned against. While I share the general caution about state power in this area, the majority's decision also has the unfortunate effect of requiring prison officials to allow inmates to unnecessarily suffer by empowering them to make a choice a court has concluded they are not capable of making. And even more, the court expands the Supreme Court's substantive due process doctrines, a disquieting development to say the least.

¶110 The state's policy of allowing mentally ill inmates under its custody, whose treatment is in their medical interest, to be involuntarily medicated when found incapable of rendering informed consent is reasonably related to the state's legitimate penological interest in caring for those inmates. And getting to the heart of this matter, this is a policy choice the people have retained for themselves. They have not asked the judiciary to do it for them. Because this policy choice is not prohibited by the Constitution, I respectfully dissent.

¶111 I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK joins this dissent.

21