## COURT OF APPEALS
## DECISION
## DATED AND FILED

## September 8, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

| | |
|---|---|
| **Appeal No.** **2021AP986-FT** | **Cir. Ct. No. 2008ME103** |
| **STATE OF WISCONSIN** | **IN COURT OF APPEALS**<br>**DISTRICT II** |

IN THE MATTER OF THE MENTAL COMMITMENT OF E.A.B., JR.:

WAUKESHA COUNTY,

    PETITIONER-RESPONDENT,

  V.

E.A.B., JR.,

    RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Waukesha County: MARIA S. LAZAR, Judge. *Affirmed.*

¶1 REILLY, J.[1] E.A.B., Jr. appeals from an order of the circuit court extending his involuntary commitment and also challenges the order for involuntary medication and treatment. He argues that Waukesha County (the County) failed to establish that he is dangerous pursuant to WIS. STAT. § 51.20(1)(a)2.b., (1)(am). We conclude that the evidence supports the circuit court's conclusion that E.A.B. is mentally ill, a proper subject for treatment, and would be a proper subject for commitment if treatment were withdrawn. *See* § 51.20(1)(a), (am). We also agree that the evidence was sufficient to support the involuntary medication and treatment order. We affirm.

## *Background*

¶2 In 2008, E.A.B. was involuntarily committed for a three-month period after he was found mentally ill, a proper subject for treatment, and dangerous pursuant to WIS. STAT. § 51.20(1)(a)2.e. E.A.B. was previously diagnosed with schizophrenia and depressive disorder, and he also has a traumatic brain injury (TBI) from an auto accident that occurred when he was driving while under the influence of alcohol. Prior to this commitment in 2008, E.A.B. had stopped taking his prescription medications, which led him to experience "a period of decompensation characterized by auditory hallucinations, rapid and pressured speech, use of shouting and vulgar language, and overall poor self-care." E.A.B.'s commitment has since been extended several times.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

¶3 The County again petitioned for an extension of E.A.B.'s involuntary commitment, pursuant to WIS. STAT. § 51.20(1)(am), on December 21, 2020. The Extension of Commitment Report accompanying the petition noted that the requested extension was based on E.A.B.'s "longstanding history of illness, his history of noncompliance with oral medications, and his lack of insight into his disorder and ongoing need for treatment" as well as an incident on August 5, 2020, where E.A.B. "was placed under a [WIS. STAT. ch.] 51 emergency detention after becoming increasingly more aggressive and hostile at his longstanding City of Waukesha group home placement."

¶4 The circuit court held an extension hearing in January 2021. During this hearing, Dr. Cary Kohlenberg, M.D., and Danielle Weber, licensed clinical social worker, testified that E.A.B. suffers from a mental illness, needs ongoing treatment with antipsychotic medication and ongoing case management with a safe and secure living environment, and is dangerous. Both Weber's Extension of Commitment Report and Kohlenberg's Report of Examination of E.A.B. were entered into evidence. We will recount the details of their testimony and those reports below. E.A.B. also testified, expressing his belief that he does not have a mental illness and that during the August 2020 incident he was defending himself.

¶5 After reviewing the evidence and the arguments of the parties, the circuit court granted the County's petition for an extension and entered orders for the extension of the involuntary commitment and involuntary medication and treatment, effective for one year. E.A.B. appeals.

*Involuntary Commitment and Standard of Review*

¶6     To involuntarily commit a person, the county must prove three elements by clear and convincing evidence: (1) the person is mentally ill, (2) the person is a proper subject for treatment, and (3) the person is dangerous pursuant to any of the five dangerousness standards enumerated in WIS. STAT. § 51.20(1)(a)2.a.-e. *See* § 51.20(1)(a)1.-2., (13)(e); ***Langlade County v. D.J.W.***, 2020 WI 41, ¶¶23, 29, 30, 391 Wis. 2d 231, 942 N.W.2d 277; ***Fond du Lac County v. Helen E.F.***, 2012 WI 50, ¶20, 340 Wis. 2d 500, 814 N.W.2d 179. The circuit court may extend an individual's commitment for up to one year after an initial commitment order. Sec. 51.20(13)(g)1.; ***D.J.W.***, 391 Wis. 2d 231, ¶31.

¶7     The same standards apply to extensions of a commitment, except the county may satisfy the showing of dangerousness by demonstrating "that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." WIS. STAT. § 51.20(1)(am); ***Portage County v. J.W.K.***, 2019 WI 54, ¶¶18-19, 386 Wis. 2d 672, 927 N.W.2d 509. "[Section] 51.20(1)(am) 'recognizes that an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior, but if treatment were withdrawn, there may be a substantial likelihood such behavior would recur.'" ***D.J.W.***, 391 Wis. 2d 231, ¶33 (quoting ***J.W.K.***, 386 Wis. 2d 672, ¶19). "However, dangerousness remains an element to be proven to support both the initial commitment and any extension." ***Id.*** (citation omitted). Thus, § 51.20(1)(am) "mandates that circuit courts ground their conclusions in the subdivision paragraphs of [§ 51.20(1)(a)2.]" ***Id.***, ¶41. "The evidentiary pathway set forth by sub. (1)(am) 'acknowledges that an individual may still be dangerous despite the absence of recent acts, omissions, or behaviors exhibiting

dangerousness outlined in § 51.20(1)(a)2.a-e.' but it 'does not change the elements or quantum of proof required.'" ***D.J.W.***, 391 Wis. 2d 231, ¶34 (quoting ***J.W.K.***, 386 Wis. 2d 672, ¶24).

¶8     Whether the county has met its burden in a commitment proceeding is a mixed question of fact and law. ***D.J.W.***, 391 Wis. 2d 231, ¶24. "[W]e will uphold a circuit court's findings of fact unless they are clearly erroneous," meaning that they are "against the great weight and clear preponderance of the evidence." ***Id.*** Whether the facts in the record satisfy the statutory standard for recommitment, however, is a question of law that this court reviews de novo. ***Id.***, ¶25.

*Sufficiency of the Evidence: Dangerousness*

¶9     E.A.B. argues that the evidence presented by the County was "insufficient to prove a substantial likelihood that, but-for a recommitment order, E.A.B. would become dangerous." Specifically, he asserts that his initial commitment was not linked to aggression or violent acts; it was based on the fifth standard under WIS. STAT. § 51.20(1)(a)2.e. Thus, "[t]he only possible evidence to support the court's [recommitment] order is the disputed incident in August 2020." The County, E.A.B. argues, failed to present any concrete details regarding that incident, and the circuit court failed to determine whether or not he was acting in self-defense.

¶10     We conclude that pursuant to WIS. STAT. § 51.20(1)(am), the County has established by clear and convincing evidence that there is a substantial likelihood that E.A.B. would be a proper subject for commitment if treatment were withdrawn. At the hearing, Kohlenberg testified that he completed a telephonic evaluation of E.A.B. in December 2020, but he had also "evaluated him six or

seven times over the last 11 years." His opinions were based on these evaluations as well as E.A.B.'s treatment records. He explained that E.A.B. "experiences schizophrenia," including "ongoing delusional beliefs, auditory hallucinations, and impaired thought process," which "grossly impair[s] his judgment, behavior, capacity to recognize reality, or ability to meet ordinary demands of life."

¶11 Kohlenberg agreed that E.A.B. is a proper subject for "ongoing treatment with antipsychotic medication, as well as ongoing case management and a safe and secure living environment where his needs, including medications, are administered and monitored." He noted that while E.A.B.'s treatment "reduces his symptoms, … it does not eliminate his symptoms," but it does "decrease[] [the] severity of his behavioral symptoms like aggression and agitation. It also helps to improve his thought process and decrease the severity of his delusional beliefs and auditory hallucinations." When asked whether E.A.B. would "become dangerous under one of the five standards if treatment were withdrawn," Kohlenberg opined that "he would become dangerous to others. He may have trouble caring for his needs as well, but the primary concern would be aggression and danger towards others, as he has repeatedly experienced."

¶12 In particular, Kohlenberg described the incident in August 2020 where E.A.B. "became physically aggressive and hostile at caregivers, including physically attacking a staff member." According to the Extension of Commitment Report, E.A.B. "began pushing a staff member, and eventually pushed a staff member to the ground. It was further reported that [E.A.B.] was breaking several picture frames throughout the group home and had approached the child of a staff member in an aggressive manner, scaring the child." As a result, E.A.B. was taken into custody on an emergency detention; admitted to the Waukesha County Mental Health Center, where he remained inpatient for a week; and was

discharged to a new group home, "as he was not welcome back to his long-term placement [at the previous group home] following the aggressive act."

¶13 On cross-examination, counsel addressed E.A.B.'s TBI. Kohlenberg agreed that E.A.B.'s TBI is not curable and that "any type of medication will not completely eradicate [E.A.B.'s] delusions and symptoms," but noted that his hallucinations, delusions, and aggressive behaviors appeared to lessen following medication adjustments. Kohlenberg testified that E.A.B. "was hospitalized at least once in the summer of 2019" "due to medication refusal" where "he was described as anxious and impulsive" and "[h]e was reported as hearing voices and not sleeping." When pressed, Kohlenberg observed a lack of documentation indicating physically aggressive behaviors exhibited by E.A.B. in the three years prior to 2019. When asked whether E.A.B.'s "delusions or hallucinations somehow make him more aggressive," Kohlenberg stated that he "believe[s] so." According to Kohlenberg,

> the content that has been documented by collateral information, both in the past and more recently, has been a belief that mental illness does not exist and thus medications are not needed and, directly, the subject referred me to a specific page in the New Testament and told me that if I would read this, I would find out that mental illness is nonexistent. So I believe these delusional beliefs upset him, because he believes that being given medication and being forced to take medication is not appropriate.

¶14 Weber, who had been working with E.A.B. for the past "almost three years," also testified. She too recounted E.A.B.'s need for an "emergency [detention] in August 2020 after becoming aggressive and hostile at his group home." According to Weber, she was recommending that E.A.B.'s commitment be extended as he

7

> has a long-standing history of schizophrenia and treatment with our department. He has a history of non-compliance with medications when not under the court order, which resulted in him becoming psychotic within eight weeks of the medications ending [in 2008]. [E.A.B.] has consistently demonstrated no insight into his disorder and need of treatment. He denies that he has schizophrenia or mental health issues, and he denies that he needs medication, or that the medication benefits him.
>
> ….
>
> My concern that should the commitment not be extended and [E.A.B] not be on an involuntary order to receive treatment is that he would stop his psychiatric medication, which has been keeping him in the community, and he would be at risk of losing his housing due to aggressive outbursts that may result from him not being properly medicated. And also having to be re-detained at an inpatient unit to be re-stabilized.

¶15    On cross-examination, Weber indicated that E.A.B. had "consistently demonstrated religious delusions throughout the entire time that [she had] known him," but that she was not aware that a religious hallucination or delusion was responsible for the August 2020 incident. She reiterated, both at the hearing and in her report, that "after being off his medication for eight weeks in 2008," E.A.B. "became psychotic," "was neglecting self care," and "was in danger of losing his long-standing group home placement because of [his] behaviors," which resulted in the initial commitment filed in this case. Since 2008, however, he had not been "psychotic" "because he was consistently on medications."

¶16    Finally, E.A.B. testified. He explained that he does not believe that he needs to be under a commitment order as he is "not psychotic or delusional," observing that "[t]here's voices on page 115 of the bible that lets people go to heaven for talking to voices." E.A.B. argued that the "[p]sychiatrists fake my tests to make me look mentally ill." As to the August 2020 incident, he informed the

court that he defended himself: "The caregiver pushed me first and pushed me to the ground, and I defended myself pushing my caregiver back."

¶17 The circuit court concluded that extension of E.A.B.'s commitment was appropriate under the circumstances. The court determined that "there is evidence of the schizophrenia that existed prior to the [TBI]." It observed that "while it's true that the [TBI] is not curable, and it's also true the medication cannot completely eliminate the symptoms of the schizophrenia," based on the testimony, "by using medication, there is a decrease in the symptoms of schizophrenia and some of those delusional behaviors, some of those hallucinations, the need for inpatient…. So the fact that there is some improvement by use of medication, indicates that the schizophrenia is being treated to some extent by the medication." As to the August 2020 incident, the court acknowledged "the two views" "of what happened there," but it went on to rely on Weber's and Kohlenberg's testimony and reports regarding the incident in reaching its conclusion. The court ultimately determined

> that grounds for extensions of commitment have been established. The subject is mentally ill, dangerous because of the paragraphs that I have identified, F and B [(WIS. STAT. § 51.20(1)(am) and (1)(a)2.b.)],[2] and possibly D [(§ 51.20(1)(a)2.d.)]. The Court finds that [E.A.B.] is a proper subject for treatment, a resident of Waukesha County. His dangerousness is likely to be controlled with appropriate medication administered outpatient.

---

[2] E.A.B. explains in his brief-in-chief that the "court's comments are initially confusing because [WIS. STAT.] § 51.20(1)(a)2. does not contain a paragraph 'f.'" E.A.B. observes that "the standardized form for the examiner's report utilized by Dr. Kohlenberg contains paragraphs a-f when discussing dangerousness. The first five paragraphs are the statutory dangerousness standards; paragraph f is the recommitment language found in … § 51.20(1)(am)." We agree with E.A.B.'s observations and agree that the court's reference to "F" is to § 51.20(1)(am).

¶18    We conclude that the factual findings of the circuit court were not clearly erroneous and that the court correctly concluded that the County established that E.A.B. is a proper subject for commitment pursuant to the statute. E.A.B. does not challenge the court's findings that he is mentally ill and a proper subject for treatment. E.A.B.'s argument is that the County failed to establish that he is dangerous. Thus, we must consider only whether the evidence presented by the County meets the standard for dangerousness under WIS. STAT. § 51.20(1)(a)2.b. "as viewed through the lens of § 51.20(1)(am)." *See **D.J.W.***, 391 Wis. 2d 231, ¶50. The County maintains that the "court correctly found, based on [§] 51.20(1)(a)2.b. and the recommitment standard, that E.A.B. is dangerous."[3] We agree.

¶19    Kohlenberg testified to a reasonable degree of medical certainty that E.A.B. would become dangerous under one of the five standards enumerated in WIS. STAT. § 51.20(1)(a)2. if treatment were withdrawn: "I believe he would become dangerous to others. He may have trouble caring for his needs as well, but the primary concern would be aggression and danger towards others, as he has repeatedly experienced." *See* § 51.20(1)(a)2.b.[4] This testimony was unrebutted. Kohlenberg explained that the medication "decreases severity of his behavioral symptoms like aggression and agitation. It also helps to improve his thought

---

[3] We note that throughout the County's briefing, it cites only to the appendix. A party is required to include appropriate references to the record in its briefing. WIS. STAT. RULE 809.19(1)(d)-(e). The appendix is not the record. *United Rentals, Inc. v. City of Madison*, 2007 WI App 131, ¶1 n.2, 302 Wis. 2d 245, 733 N.W.2d 322.

[4] WISCONSIN STAT. § 51.20(1)(a)2.b. provides, in pertinent part, that an "individual is dangerous because he or she" "[e]vidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm."

process and decrease the severity of his delusional beliefs and auditory hallucinations." His medical opinions were founded upon E.A.B.'s treatment records as well as his evaluations "over the last 11 years." Kohlenberg testified that the "foundation for [his] belief" that E.A.B. "would be a danger to others due to physical aggression" was that "[t]his has been an experience for [E.A.B.] reoccurring over many years, including most recently in August of this last year." Although not required under § 51.20(1)(am), *see* **J.W.K.**, 386 Wis. 2d 672, ¶19 (noting that the recommitment standard "recognizes that an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior"), the County presented evidence of a recent incident in August 2020 where E.A.B. exhibited physical aggression toward others, including attacking a staff member at his group home, breaking pictures on the wall, and scaring a staff member's child. Kohlenberg testified that E.A.B. would not take medication if not under a commitment order, and both he and Weber opined that without treatment E.A.B. would decompensate, as had happened in the past.

¶20 Under the circumstances and based on our independent review, we agree with the circuit court that the County presented clear and convincing evidence that "there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." *See* WIS. STAT. § 51.20(1)(am).

*Involuntary Medication and Treatment*

¶21 Pursuant to WIS. STAT. § 51.61, an individual has the right to refuse medication unless a court has determined that the individual is not competent to make that decision. **Outagamie County v. Melanie L.**, 2013 WI 67, ¶¶53, 89, 349

11

Wis. 2d 148, 833 N.W.2d 607. There are two ways for an individual "who is mentally ill and who has received the requisite explanation of the advantages and disadvantages of and alternatives to medication" to be found incompetent to refuse medication. *Id.*, ¶54. One is if "[t]he individual is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives," and the second is if "[t]he individual is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness ... in order to make an informed choice as to whether to accept or refuse medication or treatment." Sec. 51.61(1)(g)4. The County bears the burden of establishing that an individual is not competent to refuse medication by clear and convincing evidence. WIS. STAT. § 51.20(13)(e); *Melanie L.*, 349 Wis. 2d 148, ¶37. We will uphold the circuit court's findings of fact unless clearly erroneous, but we review whether the County met its burden de novo. *Melanie L.*, 349 Wis. 2d 148, ¶¶38-39.

¶22    Here, E.A.B. argues that the evidence was insufficient to support the court's involuntary medication and treatment order. He claims that "the County offered only generic testimony referencing the statutory language; it did not support those assertions with further testimonial evidence." E.A.B. does not argue that the advantages, disadvantages, and alternatives to medication were not explained to him, and, in fact, Kohlenberg testified that the required explanations were provided. According to Kohlenberg,

> I attempted to engage him in this discussion, but he quickly shot down this discussion, telling me he has no mental illness. He has never experienced mental illness, and he does not need treatment. So rather than a full two-way discussion, I basically listed the medications categories, specific medication along with risks, benefits, and alternatives.

Kohlenberg opined, based on his evaluation of E.A.B., that E.A.B. is "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives" to medication. *See* WIS. STAT. § 51.61(1)(g)4.b. Kohlenberg acknowledged that E.A.B. "did recognize the name of the medication, but felt that it was not helpful and not needed" because "mental illness does not exist." He further explained that E.A.B. "stated that [the medication] was of no benefit, he denied having side effects, and he believed it was not necessary." E.A.B. indicated to Kohlenberg that he would not take medications if he were off commitment. Kohlenberg's report also noted that in January and March 2020, E.A.B. "required Sheriff's Department intervention in order to receive his court ordered injection."

¶23 We disagree that the County offered only "generic testimony referencing the statutory language."[5] Per our supreme court's pronouncement that "it is the responsibility of medical experts who appear as witnesses for the county to explain how they probed the issue of whether the person can 'apply' his or her understanding to his or her own mental condition," *Melanie L.*, 349 Wis. 2d 148, ¶75, Kohlenberg's testimony sufficiently conveyed that he was unable to engage E.A.B. in an effective discussion regarding E.A.B.'s treatment and the advantages

---

[5] E.A.B. also cites to *Winnebago County v. C.S.*, 2020 WI 33, ¶¶31-34, 391 Wis. 2d 35, 940 N.W.2d 875, for the proposition that a court may force medication upon a person only if he or she is "dangerous," and "there is … no proof in the record that medications are necessary because E.A.B. is 'dangerous.'" As the County points out, C.S. was an *inmate* whose commitment and involuntary medication orders were based on WIS. STAT. § 51.20(1)(ar) and WIS. STAT. § 51.61(1)(g)3., which do not require a determination of dangerousness. *C.S.*, 391 Wis. 2d 35, ¶¶1-2, 5, 34. In this case, however, the County is required to prove that E.A.B. is dangerous for his recommitment order. *See* § 51.20(1)(a)2., (am); *Langlade County v. D.J.W.*, 2020 WI 41, ¶¶31-34, 391 Wis. 2d 231, 942 N.W.2d 277. E.A.B. appears to concede this point in his reply, noting only his position that the County failed to establish that he is "sufficiently dangerous." As we previously determined that the County established that E.A.B. is dangerous pursuant to the terms of the statute, we will address this argument no further.

and disadvantages, as E.A.B. does not recognize that he is mentally ill. While E.A.B. was able to recognize the name of the medication, he was unable to convey the risks and benefits or whether he suffered any side effects as a result of the treatment. *See **Virgil D. v. Rock County***, 189 Wis. 2d 1, 14-15, 524 N.W.2d 894 (1994). Both Kohlenberg and Weber testified that the medication has therapeutic value in treating E.A.B.'s mental illness, despite E.A.B's belief that it is unnecessary. As our supreme court has recognized, "[i]t may be true that if a person cannot recognize that he or she has a mental illness, logically the person cannot establish a connection between his or her expressed understanding of the benefits and risks of medication and the person's own illness." ***Melanie L.***, 349 Wis. 2d 148, ¶72. Accordingly, the County has established that E.A.B. is not competent to refuse medication or treatment and the circuit court properly entered the involuntary medication and treatment order. *See* WIS. STAT. § 51.61(1)(g)4.b.

*Conclusion*

¶24 We conclude that the evidence presented by the County established that E.A.B. is dangerous within the meaning of the commitment statute such that he "would be a proper subject for commitment if treatment were withdrawn," WIS. STAT. § 51.20(1)(a)2.b., (1)(am), and that E.A.B. "is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his … mental illness ... in order to make an informed choice as to whether to accept or refuse medication or treatment," WIS. STAT. § 51.61(1)(g)4.b. We affirm.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

14